Jan R. PURGESS, M.D., Plaintiff–
Appellee–Cross–Appellant,

v.

Nigel SHARROCK, M.D. and The Hospi-
tal for Special Surgery, Defendants–
Appellants–Cross–Appellees.

Nos. 1425, 1669, Dockets, 93–7969, 93–9099.

United States Court of Appeals,
Second Circuit.

Argued May 3, 1994.

Decided Aug. 17, 1994.

Ronald S. Rolfe, New York City (Cravath, Swaine & Moore, Lewis J. Liman, Brian D. Hail, of counsel), for defendants-appellants-cross-appellees.

Michael G. Berger, New York City, for plaintiff-appellee-cross-appellant.

Before: PRATT and JACOBS, Circuit Judges, and MOTLEY, Senior District Judge, United States District Court for the Southern District of New York, sitting by designation.

PRATT, Circuit Judge:

When Dr. Jan R. Purgess, an anesthesiologist, was terminated from employment at the Hospital for Special Surgery ("HSS"), he brought this action, asserting several claims against HSS and Dr. Nigel E. Sharrock, its Director of Anesthesiology. His claims included alleged violations of the federal antitrust laws plus state claims of breach of contract, defamation, and tortious interference with prospective economic advantage. The district court dismissed before trial all of the federal claims except a Sherman Act claim, which was dismissed by judgment as a matter of law after all of the evidence was submitted to the jury.

After thirteen days of trial, the jury returned verdicts on the state-law claims totalling $4.6 million in compensatory damages, plus $4.6 million in punitive damages. Purgess consented to a remittitur of $4.1 million on the punitive damages award. Judgment was therefore entered in the amount of $5.1 million.

Sharrock and HSS do not challenge on appeal the judgment on the breach of contract claim. They do, however, present multiple issues relating to the other claims, including challenges to jurisdiction, sufficiency of evidence, jury instructions, and admissibility of evidence. Finding no merit in any of defendants' challenges, we affirm on defendants' appeal.

Purgess cross-appeals claiming that: (1) the amount of punitive damages should be modified to the extent of reinstating the full $4.6 million jury award; and (2) the district court erred in dismissing Purgess's federal antitrust claim of a group boycott. Purgess presses his group-boycott appeal only if we should order a new trial on any of the other claims. Since we are not disturbing the district court's judgment, Purgess's group-boycott claim is treated as withdrawn. Since Purgess accepted the remittitur, we dismiss that aspect of his cross-appeal.

## FACTS AND BACKGROUND

Purgess began a provisional, one-year appointment to HSS in October 1988. He had worked at New York University Medical Center ("NYU") the previous six years, during the last three of which he had been an attending anesthesiologist, specializing in cardiac surgery.

Two months after he had been hired by HSS, Purgess was interrupted, while administering anesthesia for a spinal surgery operation, by a summons to the office of Dr. Nigel E. Sharrock, Director of the Department of Anesthesiology. In the presence of then Associate Director John A. Ahearn, Purgess was asked to submit his resignation, and was told that his alternative to resignation was to be terminated, effective immediately.

Before that meeting, Purgess had not been involved at HSS in any formal or informal investigation, and HSS conceded that before terminating Purgess, there never had been any formal finding "that Dr. Purgess either caused or contributed to the problems" of any patient he had treated at HSS. Similarly, HSS had never deemed any incident involving Purgess to be reportable to the State Office of Health Systems Management, although a report is required whenever there is any incident involving a physician that "cause[s] patient harm."

When challenged by Sharrock, Purgess refused to resign, because he did not believe that he had done anything wrong, and because he thought a resignation might serve as a waiver of his rights to a fair hearing and other procedural protections. True to his threat, Sharrock told Purgess he was terminated. Despite multiple requests by Purgess for fair review of his termination and for a hearing, the hospital board approved Shar-

rock's action and did not provide Purgess with a hearing, as required under HSS's by-laws.

After Purgess's termination, Sharrock and other HSS officials sent several communications to other hospitals and state medical examiners; it is these communications that form the basis for Purgess's state and federal claims.

### 1. New York State Office of Professional Medical Conduct

On January 6, 1989, after plaintiff had been terminated, the president of HSS filed a report with the New York State Office of Professional Medical Conduct (OPMC), stating that plaintiff's "privileges" at HSS had been "revoked" "pursuant to Section 2803–e.1.(a) of the Public Health Law." That provision requires a report of a physician's termination to be filed *only* if the termination is for "reasons related in any way to alleged mental or physical impairment, incompetence, malpractice or misconduct or impairment of patient safety or welfare." Purgess claims that the mere filing of this report by HSS with a specific reference to the statute constituted a statement that he had been terminated for one of the defects listed in the statute.

But HSS went even further. Purportedly to justify his loss of privileges and his termination, HHS also sent to OPMC five medical charts represented as relating to patient incidents involving Purgess. One of those five cases involved another anesthesiologist, not Purgess, and the error was not inadvertent, for Ahearn, who had prepared the certification accompanying the records, admitted that before he sent the charts to OPMC, he knew that the patient involved had not been Purgess's patient.

### 2. New York University Medical Center

After he was terminated by HSS, Purgess applied to NYU for reinstatement of the privileges he had held there before resigning to begin work at HSS. As required by law, NYU then sent to HSS a questionnaire relating to Purgess's work at HSS. In response to the question whether he had been termi-nated "for alleged malpractice or misconduct", HSS marked "Yes."

After receiving the filled-out questionnaire from HSS, NYU, through Dr. Turndorf, requested details about the circumstances of Purgess's termination. Mr. Ahearn explained that Purgess had been involved in four quality-of-care incidents at HSS. The most serious were two "episodes of asystole". The term asystole refers to a "heart stoppage" and carries an implication that the anesthesiologist had done "something wrong" and either "not * * * recognized it right" or not "treated it right". Also, in a telephone conversation with Turndorf, Sharrock continued to assert that Purgess had been terminated because he was responsible for *two* asystoles. In a pretrial filing with the court that was read to the jury, Sharrock and HSS had admitted that "[HSS's] reference to a second incident of asystole (in the letter to NYU) was a mistake," and that "another doctor was the attending anesthesiologist during the other incident of asystole." Turndorf testified that even though he "had a lot of confidence in Purgess" and "knew that Purgess was a good practitioner," HSS's allegations "sound[ed] suspiciously as though Purgess had really done something wrong," and he "didn't feel in good conscience [that he] could appoint Purgess to [NYU]." Purgess did not receive an offer of employment from NYU.

### 3. New Jersey Board of Medical Examiners

In early 1989, shortly after HSS had terminated Purgess's employment, Purgess applied for a private-practice position as anesthesiologist at Hackensack Hospital in New Jersey, a position that required him to obtain a New Jersey license. But Sharrock and HSS failed to respond to inquiries from the New Jersey Board of Medical Examiners ("BME"), and thereby delayed his licensing in that state and made it impossible for him to work at Hackensack. The BME explained that "[t]he hospital [HSS] was contacted by phone and they declined to offer any additional information. The board office followed up with a letter requesting additional information and none has been forthcoming as

yet." Purgess did not receive an offer of employment from Hackensack.

Purgess filed a complaint in the United States District Court for the Southern District of New York against Sharrock and HSS, alleging violations of the Sherman Act, 15 U.S.C. §§ 1, 2 (1988), and the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(a)(b), (c) and (d) (1988), denials of due process and equal protection, and pendent state claims of breach of contract, libel and slander, tortious interference with prospective economic advantage, fraudulent inducement, "wrongful withdrawal of privileges and academic affiliation", unfair competition, and intentional infliction of extreme emotional distress.

Early in the litigation, Judge David N. Edelstein denied completely defendants' motions to dismiss under Rule 12(b)(6); however, before trial, Judge Louis J. Freeh, to whom the case had been reassigned, dismissed all of Purgess's claims except those alleging a group boycott in violation of Sherman Act § 1, libel and slander, breach of contract, and tortious interference with prospective economic advantage.

After a thirteen-day trial, the jury awarded Purgess compensatory damages of $400,-000 on the breach of contract claim, $700,000 on the tortious-interference claim, $3.5 million on the claims of libel and slander, and $4.6 million in punitive damages. The district court denied defendants' post-trial motion for judgment as a matter of law, but ordered a new trial unless Purgess agreed to a remittitur of the punitive damages award to $500,000. Purgess accepted the remittitur, and an amended judgment in the amount of $5.1 million, plus interest was entered.

## DISCUSSION

We have considered all of the many issues defendants raise on appeal and conclude that none has merit. Our discussion will not be exhaustive, but will focus on defendants' claims as to supplemental jurisdiction, liability for defamation, liability for tortious interference with prospective economic advantage, compensatory damages, punitive damages, and admissibility of trial counsel's statement of fact.

### 1. Supplemental Jurisdiction

Defendants contend that the district court abused its discretion by exercising supplemental jurisdiction over the state-law claims. They argue that the federal claims were insubstantial and should not have been permitted to provide a predicate for federal jurisdiction. When the last federal claim was dismissed, defendants assert the court should have also dismissed the rest of the action.

■ The statutory concept of supplemental jurisdiction codified and expanded somewhat the earlier judge-made doctrines of pendent and ancillary jurisdiction. Just as with the prior law of pendent jurisdiction, the exercise of supplemental jurisdiction is left to the discretion of the district court, and this court's review is limited to whether the district court abused its discretion. 28 U.S.C. § 1367(a)(c). *See Travelers Ins. Co. v. Keeling,* 996 F.2d 1485, 1490 (2d Cir.1993).

Enacted in December 1990, § 1367(c) provides, in part, that the "[d]istrict courts may decline to exercise supplemental jurisdiction over a claim * * * if * * * (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c)(3). "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Castellano v. Board of Trustees, et al,* 937 F.2d 752, 758 (2d Cir.1991). If, however, the dismissal of the federal claim occurs "late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair. Nor is it by any means necessary." 28 U.S.C.A. 1367, Practice Commentary (1993) at 835. Moreover, the discretion implicit in the word "may" in subdivision (c) of § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants. *Castellano,* 937 F.2d at 758.

Section 1367(c) is consistent with earlier case law on this subject in this court. In *Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 545–46 (2d Cir.1989), we expressly affirmed a district court's exercise of pendent jurisdiction over state claims for breach of contract and tortious interference after dismissing the sole federal claim at the close of defendants' case. In the present case, dismissal came even later—after the close of all evidence.

We note that several district courts in this circuit have exercised supplemental jurisdiction under less compelling circumstances than those in this case. *See, e.g., Ackerman v. National Property Analysts, Inc.*, 1992 WL 240605 at *13, 1992 U.S.Dist. LEXIS 13502 at 39 (S.D.N.Y.1992) (retaining state claims after 12(b)(6) dismissal of federal claims); *Philan Ins. Ltd. v. Frank B. Hall & Co., Inc.*, 786 F.Supp. 345, 347 (S.D.N.Y.1992) (supplemental jurisdiction appropriate even when federal claims dismissed before trial); *Philatelic Foundation v. Kaplan*, 647 F.Supp. 1344, 1348 (S.D.N.Y.1986) (exercising pendent jurisdiction after granting motion to dismiss last federal claim before trial).

■ Initially, Judge Edelstein denied entirely the motions by Sharrock and HHS to dismiss. Judge Freeh did not dismiss four of the federal claims until the eve of trial, and he did not dismiss the final federal claim until the close of all the evidence. Even though the federal claims were ultimately dismissed, the district court's reluctance to dismiss them until well into the litigation reflects their substantial nature. *See Fogel v. Chestnutt*, 668 F.2d 100, 105–07 (2d Cir. 1981) (Friendly, J.), *cert. denied*, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982) (test for whether claim can survive motion to dismiss under Rule 12(b)(6) is *more* rigorous than that for whether it is substantial enough to confer federal jurisdiction).

When the district court determined, at the end of the defendants' case, to dismiss plaintiff's last federal claim, there were no compelling reasons at that point to prevent a final determination of the state claims by the jury. The parties and the court had spent years preparing for this trial in federal court; the jury had heard evidence for several days and was ready to begin its deliberations; and it would have been wasteful to subject this case to another full trial before a different tribunal. The district court did not abuse its discretion by exercising supplemental jurisdiction.

Sharrock and HSS claim further, however, that they suffered prejudice from evidence that had been admitted on the dismissed federal antitrust claim. They contend that Purgess used the federal claim to obtain in discovery and introduce in evidence extensive Quality Assurance reports that would not have been admissible in a state-court trial and that were irrelevant to the state claims. HSS is required by law to maintain Quality Assurance Physician reports for every physician who has privileges at the hospital. The reports record all quality-of-care problems that arise that involve each physician. Defendants contend that this evidence presented a substantial "likelihood of jury confusion" and prejudiced them on the state law claims. They further argue that hospitals are immune from liability relating to the filing of these reports to the state and other hospitals under New York Public Health Law § 2805–k. That statute specifically states, however, that the grant of immunity is contingent on the hospital employee "providing such information in good faith". We reject defendants' contentions.

In the first place, the Quality Assurance reports were, indeed, admissible on the state-law claims to show that Purgess's termination on standard-of-care grounds was pretextual, that Purgess's treatment of his patients was well within the normal standard of care at HSS, and that Sharrock and HSS had acted with bad faith and malice, *i.e.*, to support Purgess's claim that the real reasons for terminating him included a desire to make room on staff for Dr. King, Sharrock's personal friend, and to prevent Purgess from further questioning Sharrock's assignments and billing practices.

Second, when the Quality Assurance reports were admitted, Sharrock and HSS sought no instruction limiting their application to the antitrust claim. *See United States v. Novod*, 923 F.2d 970, 977 (2d Cir. 1991) ("The established rule is that if a party

* * * does not request a limiting instruction, he cannot complain of failure to give the instruction on review".) (quoting 21 C. Wright & K. Graham, Federal Practice and Procedure § 5036 (197*l*)). Third, defendants did not ask that the evidence be stricken after the antitrust claim was dismissed. Finally, Sharrock and HSS were not substantially harmed by this evidence, since there was significant other proof of the defendant's malice and bad faith. Fed.R.Civ.P. 61.

## 2. Liability for Defamation

Defendants contend that there was insufficient evidence to support the jury's verdict of liability for defamation. They also claim that even if defamatory, their statements were of opinion, not fact, and therefore were insufficient to support liability. Further, defendants urge that their defenses of truth and qualified privilege defeat liability as a matter of law.

 The standard for determining whether evidence is sufficient to create an issue of fact for a jury is the same on appeal as it is in the trial court. *Samuels v. Air Transport Local,* 992 F.2d 12 (2d Cir.1993). In considering a motion for j.n.o.v. a trial court must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor. It "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Mattivi v. South African Marine Corp. "Huguenot,"* 618 F.2d 163, 167.

 In deciding whether the jury should be allowed to pass upon statements alleged to be defamatory, the court need only determine that the contested statements "are reasonably susceptible of defamatory connotation." *James v. Gannett,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976). If any defamatory construction is possible, it is a question of fact for the jury whether the statements were understood as defamatory. *Church of Scientology v. Eli Lilly & Co.,* 778 F.Supp. 661, 666 (S.D.N.Y.1991). There was ample evidence here for the jury to find not only that the defendants' statements could be understood as defamatory, but in fact that

they were so understood and seriously injured plaintiff's professional reputation.

Some of the defendants' statements to NYU and OPMC were reasonably susceptible of defamatory construction. They either expressly represented or implied that Purgess was responsible for two episodes of "asystole", or heart stoppage, when in fact only one of Purgess's patients had such an incident. Based on those statements alone, the jury was entitled to find that defendants had published a false fact about Purgess. The hospital's formal report that it had terminated Purgess for malpractice in the treatment of patients, which was based on false information, became a part of his permanent record, had a damning effect on the doctor's professional reputation, and was subject to defamatory meaning.

Defendants also claim that their statements were expressions of opinion, not fact, and therefore could not be the predicate for a defamation action. *See Immuno A.G. v. Moor–Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d. 1270 (1991). Defendants' statements to NYU and OPMC regarding the alleged asystoles were affirmative representations about what had happened to the patients at issue during surgery. Under the circumstances, those statements were representations of fact that defamed Purgess by falsely portraying his professional conduct. *See Lasky v. American Broadcasting Co., Inc.,* 606 F.Supp. 934, 937 (S.D.N.Y.1985) (statements are libelous *per se* if they "imput[e] to the person misconduct, incapacity, unfitness or lack of any qualification deemed necessary for the conduct of the profession").

Defendants further contend that the defamatory statements were substantially true, and therefore, could not support a charge of libel and slander. However, a reasonable jury could and did find on this record that when Sharrock and HSS checked "yes" in answer to the question whether Purgess had been terminated "for alleged malpractice or misconduct", they had deliberately exaggerated the severity of the purported incidents and mischaracterized and defamed Purgess. In addition, the jury could have concluded

that defendants had exaggerated the severity of the incidents to justify their actions. *See Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 60–61 (2d Cir.1993) (holding that defamer's exaggeration of an incident to make it seem more dangerous permits the inference of "an ulterior improper motive for magnifying the circumstance").

■ Defendants claim that their defamatory statements to NYU and OPMC, which are the basis for the defamation claim, were required to be sent under N.Y. Public Health Law §§ 2803–e(3)(b) and 2805–k(4) (McKinney Supp.1993), and that they are therefore protected by a defense of qualified privilege against an otherwise meritorious claim of defamation. Defendants rely specifically on § 2805–k New York Public Health Law, which provides qualified immunity to a hospital from civil liability for the filing in good faith of information with the state and other hospitals. *See* New York Public Health Law § 2805–k(4). However, that statute specifically states that the grant of immunity is contingent on the hospital employee "providing such information in good faith".

While it is true that the hospital was required to report, and therefore was privileged in reporting, "the suspension, restriction, termination or curtailment of the * * * professional privileges * * * for reasons related in any way to alleged mental or physical impairment, incompetence, malpractice or misconduct or impairment of patient safety or welfare", N.Y.Pub.Health L. § 2803–1(1)(a), the jury could reasonably have found that the hospital and Sharrock lost the protection of the qualified privilege by abusing it—by providing information that was "untrue and communicated with malicious intent." *See* § 2805–m of the Public Health Law. As we stated in *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 62 (2d Cir.1993):

A plaintiff may demonstrate abuse of the privilege by proving that the defendant acted (1) with common law malice, id., or (2) outside the scope of the privilege, see *Harris v. Hirsh,* 161 A.D.2d 452, 454, 555 N.Y.S.2d 735, 737 (1st Dep't 1990), or (3) with knowledge that the statement was false or with a reckless disregard as to its truth. *Liberman, [v. Gelstein,]* 80 N.Y.2d

[429] at 437–438, 590 N.Y.S.2d [857] at 862, 605 N.E.2d [344] at 349; *Loughry v. Lincoln First Bank, N.A.,* 67 N.Y.2d 369, 376, 502 N.Y.S.2d 965, 968, 494 N.E.2d 70, 73 (1986)

Thus, while a qualified privilege may be invoked when a defendant's acts were for a proper purpose and exercised in a reasonable manner, it is nevertheless, " 'forfeited if the defendant steps outside of the scope of the privilege or abuses the occasion.' " *Harris,* 161 A.D.2d at 453, 555 N.Y.S.2d at 737 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 115 at 832 (5th ed. 1984)). Moreover, a defendant exceeds the scope of the privilege if the defamatory statement is made "in furtherance of an improper purpose." *Id.*

The district court correctly found that viewing the evidence in a light most favorable to Purgess, a jury could reasonably find that defendants acted with actual malice in making the challenged statements to NYU and OPMC. There is sufficient evidence in the record for the jury to have found that at the time the reports were made to OPMC, defendants acted with deliberate intent to injure Purgess, that they acted with a wanton disregard of the reports' falsity, that they made the disparaging statements about Purgess to justify his termination, which had been effected in violation of hospital procedures and in order to make room on the hospital staff for Sharrock's friend, Dr. King.

### 3. Liability for Tortious Interference

■ Defendants contend that the evidence is insufficient to support the verdict of tortious interference. In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship. *Burba v. Rochester Gas & Elec. Corp.,* 528 N.Y.S.2d 241, 528 N.Y.S.2d 241 (A.D. 4 Dept.1988); *See also PPX Enterprises, Inc. v. Audio Fidelity Enterprises, Inc.,* 818 F.2d 266, 269 (2d Cir. 1987).

142

■ There was sufficient evidence in the record for the jury to find all of these factors in connection with Purgess's attempts to obtain employment at NYU and at Hackensack. As previously noted, the jury could reasonably find that defendants acted with malice in reporting to NYU that Purgess had been terminated for specific incidents of malpractice. Similarly, the jury could reasonably find that defendants acted unfairly or improperly in failing to respond to requests for information about Purgess.

Evidence in the record also shows that defendants' reports and communications about Purgess injured his relationships with both institutions. Turndorf of NYU testified that he had serious reservations about hiring Purgess after communicating with Sharrock and HSS. In addition, there was evidence that Purgess had an opportunity to work at Hackensack Hospital in New Jersey, but that defendants' substantial delay in providing the New Jersey Board with the necessary information regarding his termination, prevented Purgess from obtaining that new position. The jury could reasonably have concluded that defendants used dishonest, unfair, or improper means in interfering with plaintiff's relationship with NYU and/or the New Jersey Board.

We also reject defendants' arguments that Purgess's relationship with the New Jersey Board cannot provide the basis for a tortious interference claim. As the district court noted in its Order and Opinion dated August 18, 1993,

Defendants have cited no New York authority supporting their claim that a physician's relationship with a state licensing board is not economic in nature. *Compare Blank v. Kirwan*, [39 Cal.3d 311, 216 Cal. Rptr. 718, 729–30] 703 P.2d 58, 70 (Cal. 1985) (relationship between potential club owner and city licensing board). Given the unique characteristics of that relationship, the court declines to find that it is not protectible under a tortious interference theory.

*Purgess v. Sharrock, et al,* No. 91 Civ. 621, 1993 WL 328919, at *8, 1993 U.S. Dist. LEXIS 11691 at *20.

4. Compensatory Damages

■ Defendants contend that the compensatory damages for libel and slander and for tortious interference were not proved with reasonable certainty. Specifically, defendants contend that there was no evidence of the salary plaintiff would have received at N.Y.U., or at any other institution.

The record contains sufficient evidence to support the $3.5 million award on defamation. Several witnesses testified that the average anesthesiologist at a private-practice hospital in the New York area earned approximately $500,000 per year in 1988. As a result of the defamation, plaintiff, who was unemployed for seven months after his termination, was able to gain employment only at a VA Hospital at the comparatively low salary of $130,000. It was not unreasonable for the jury to conclude that Purgess would have earned substantially more in future years had he not been defamed.

As to damages on the tortious-interference claim, it is important to note that the New York Court of Appeals has held that "[i]n an action against a third party for tortious interference, * * *, the elements of damages would be those recognized under the more liberal rules applicable to tort actions." *Guard–Life Corp. v. S. Parker Hardware Manuf. Corp.,* 50 N.Y.2d 183, 197, 428 N.Y.S.2d 628, 636 (1980) (citing Restatement, Torts 2d § 774A, Comment C.). There was sufficient evidence in the record for the jury to conclude that Purgess's salary at either NYU or Hackensack hospitals in the greater New York metropolitan area, would have been significantly higher than it was at the VA Hospital. Even Sharrock testified that "the average individual in typical private practice, anesthesiology would gross somewhere around $500,000." A jury could reasonably conclude that anesthesiologists at NYU or Hackensack hospitals would earn comparable amounts. Surely, they could find that Purgess's salary would have been significantly higher than at the VA hospital. There was sufficient evidence in the record to support the verdict on compensatory and tortious interference damages.

## 5. Punitive Damages

■ The defendants objected to the district judge's instruction that the jury could award punitive damages. The court charged the jury that

If you find that defendants' statements about Dr. Purgess were not made with deliberate intent to injure and were made in reckless disregard of the truth of those statements or their effect upon Dr. Purgess, you may make no award of punitive damages * * * *. If, on 2the other hand, you find that defendants acted with actual malice, you may, but are not required to, award plaintiff punitive damages.

The jury awarded $4.6 million in punitive damages. Although the district court reduced the amount to $500,000, defendants argue that it was error to permit any punitive damages whatsoever.

Punitive damages are awarded in tort actions. * * * Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton."

*Prozeralik v. Capital Cities Com., Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 218, 225–26, 626 N.E.2d 34, 42 (1993) (Citing Prosser and Keeton, Torts § 2 and 9–10 [5th ed. 1984] ).

We think the amount of punitive damages, as reduced by the remittitur, was appropriate. (a) The district court's charge on punitive damage expressly directed the jury to consider whether there was evidence of ill will before awarding punitive damages. (b) There was ample evidence of ill will in the record; (c) Knowing or reckless publication of false statements about an individual demonstrates a reckless disregard for his rights sufficient to establish common-law malice; and (d) The jury could readily have concluded that defendants acted egregiously. They demanded Purgess's immediate resignation without ever having given him notice of any complaints about his work; they disregarded his rights by terminating him summarily;

they ignored his repeated requests for the hearing guaranteed him by their own rules; and they destroyed his professional reputation by sending false communications to OPMC and NYU, and by failing to respond to inquiries from the New Jersey Medical Board.

## 6. Statement of Trial Counsel

■ Defendants contend that the district court erred in admitting in evidence a statement by defense counsel made in a memorandum of law.

Purgess moved during trial for the admission of a statement made by defense counsel in a footnote in a memorandum of law filed in support of defendants' motion to dismiss the complaint in an earlier related case. The trial court said that it would admit the statement on the condition that the jury be advised that the lawyer who drafted the statement now states that it was a mistake. The judge read defense counsel's statement to the jury in the form of a stipulation. It read as follows:

On March 12, 1990, a lawyer representing the defendants in this case filed a paper in this case with the Court, which included the following statement:

"The hospital's reference to the second incident of asystole was a mistake. During the one-week period mentioned above, Purgess was involved in one incident of asytole, one incident where a patient received a black eye and a cut eyelid, and one incident where Purgess applied a regional block to the wrong shoulder. It appears that another doctor was the attending anesthesiologist during the other incident of asystole.

The lawyer representing the defendants who made that statement now states that the statement is incorrect."

Federal Rule of Evidence 801(d)(2) provides, in relevant part, that a statement is not hearsay if "the statement is offered against a party and is (A) the party's own statement, in either an individual or representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth".

■ In *United States v. McKeon*, 738 F.2d 26 (2d Cir.1984), we discussed extensively when statements by counsel may be admissible against a client. *Id.* at 30. "[S]tatements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney." *Id.* (quoting *United States v. Margiotta*, 662 F.2d 131, 142 (2d Cir.1981), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983)). A court can appropriately treat statements in briefs as binding judicial admissions of fact. *Leslie v. Knight Soda Fountain*, 55 F.2d 224, 225 (2d Cir. 1932), *See also City Nat. Bank v. U.S.*, 907 F.2d 536, 544 (5th Cir.1990); *see also Young & Vann Supply Co. v. Gulf F. & a.R. Co.*, 5 F.2d 421, 423 (5th Cir.1925).

Counsel's statement of fact constituted an admission of a party. It was made in a legal brief filed with the court subject to the penalty of sanctions. There can be little dispute, therefore, that defendants' counsel was acting in an authorized capacity when making the assertion.

■ Defendants also contend that even if the statement was properly admitted, the court abused its discretion in not disqualifying defendants' trial counsel so that she could testify about the circumstances of its creation and that it was a mistake. *See* Disciplinary Rule 5–102(A) of the Code of Professional Responsibility ("if after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, [he shall withdraw from the conduct of the trial]"). We find this contention particularly disturbing since counsel admits that she "did not herself move for disqualification." Nor did she seek to withdraw from representing the defendants. Now, however, on appeal she seeks to blame the trial judge for not having thrown her off the case. To state the argument is to refute it.

■ The disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court. *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 71 (2d Cir.1990) (citations ommitted); "Disquali-

fication may be required only when it is likely that the testimony to be given by [counsel] is necessary." *S & S Hotel Ventures Limited Partnership v. 777 S.H Corp.*, 69 N.Y.2d 437, 515 N.Y.S.2d 735, 739, 508 N.E.2d 647, 650–51 (Ct.App.1987) (citing *Foley & Co. v. Vanderbilt*, 523 F.2d 1357, 1359 (2d Cir.1975)).

There was no ethical violation here, nor was there a need for counsel's testimony. The stipulation cautioned the jury that "[t]he lawyer representing the defendant who made that statement now states that the statement is incorrect." This warning served at least two purposes. It protected counsel from unfair attack and minimized the damage of the admission. The jury had no way of knowing whether present counsel and counsel who made the statement were the same person. Also, the jury could infer from counsel's present denial of the statement that the original statement was inaccurate. In addition, there was other evidence, including the testimony of Purgess, establishing that the hospital's reference to a second incident of asystole was a mistake. Therefore, while defense counsel's testimony might have been useful, it was not necessary. *Id.*

### 7. Cross–Appeal

■ On the cross-appeal, Purgess contends that the court should not have reduced the punitive damages award of $4.6 million by offering a remittitur of $4.1 million. However, Purgess' argument is barred by his acceptance of the remittitur. *See Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649–50, 97 S.Ct. 835, 836–37, 51 L.Ed.2d 112 (1977) (plaintiff could not appeal propriety of remittitur order to which he had agreed).

### CONCLUSION

The amended judgment of the district court is affirmed; plaintiff's cross-appeal is dismissed.