**Michael BUCKLEY, Plaintiff–Appellant,**

v.

**METRO–NORTH COMMUTER RAILROAD, Defendant–Appellee.**

**No. 608, Docket 95–7399.**

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1995.

Decided April 1, 1996.

Charles C. Goetsch, New Haven, CT (Cahill, Goetsch & DiPersia, P.C., of counsel), for Plaintiff–Appellant.

William G. Ballaine, New York City (Mark S. Landman, Lisa S. Rabinowitz, Ann Marie Collins, Siff Rosen P.C., of counsel), for Defendant–Appellee.

Before FEINBERG and OAKES, Circuit Judges.*

OAKES, Senior Circuit Judge:

Michael Buckley ("Buckley") appeals from the judgment as a matter of law granted by the United States District Court for the Southern District of New York, Whitman Knapp, *Senior Judge,* in favor of Metro–North Commuter Railroad ("Metro–North"). Buckley claims negligent infliction of emotional distress and medical monitoring costs arising under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.* (1994)("FELA"), for asbestos exposure Buckley suffered while working as a Metro–North pipe fitter in Grand Central Terminal. Buckley claims the district court erred in refusing to submit his negligent infliction of emotional distress claim to the jury and in failing to address his claim for medical monitoring. For the reasons stated below, we vacate and remand.

## BACKGROUND

■ In reviewing the district court's judgment as a matter of law in favor of Metro–North, we consider the facts in the light most favorable to Buckley, the non-moving party. *Purgess v. Sharrock,* 33 F.3d 134, 140 (2d Cir.1994).

Buckley, who is 41 years old, has worked for various railroad companies in different capacities since the early 1970s. In June 1985, he began to work for Metro–North as a pipe fitter, repairing and maintaining the labyrinth of pipes in the steam tunnels of Grand Central Terminal in New York City. These pipes were covered with a white insulation material that Buckley and the other pipe fitters needed to remove before performing any repair or maintenance work. Buckley would hammer, cut, and pull the insulation material, using any tools on hand, in order to expose the pipe. The insulation, a dry, dusty sort of material, would break apart as it was removed, scattering particles into the air—"just like taking baby powder and shaking it," as Buckley said. Fans used to make bearable the intense heat of the steam tunnels would further spread dust from the pieces of insulation that accumulated on the floors of the tunnels. During the work day, this dust would cover Buckley's skin and clothes and enter his nose and mouth, so that he could taste the chalky insulation material. Because Buckley and the other pipe fitters would emerge from their daily duties in the tunnels covered head to toe with white powder, they were dubbed the "snowmen of Grand Central."

The insulation material that Buckley was exposed to during his work day for roughly three years was asbestos, widely recognized as a carcinogen since the mid–1970s. Metro–North admitted that it knew the insulation was composed of asbestos and that asbestos can cause cancer. In fact, Metro–North had been cited for asbestos-related violations in September 1986 following a fire in Grand Central Terminal. Metro–North further admitted that, despite its knowledge of the problem, it did not warn Buckley that the substance covering him when he emerged from the tunnels was asbestos, nor did it train him regarding safe handling of asbestos.

On August 31, 1987, nearly a year after the fire and the asbestos citations, Metro–North finally required that pipe fitters attend an asbestos awareness class. At this class, Buckley learned of the asbestos in the pipe insulation. He was told that asbestos is a substance that can cause painful, debilitating, and often deadly disease such as asbestosis, lung cancer, and mesothelioma, a cancer of the pleura that lines the outside of the lungs. He viewed videotapes depicting people suffering from these diseases. He received instruction on asbestos removal by the "glove bag" method and was given a half-face respirator. The respirator, however, was not fit-tested. He was also shown a video that explained that smoking increases one's risk of lung cancer, and that smokers exposed to asbestos can decrease their risk of lung cancer if they quit smoking.

---

* Honorable Guido Calabresi, *C.J.,* heard oral argument but later disqualified himself and did not participate in the decision of this court.

Buckley attempted to use the half-face respirator at work, but it fit poorly and slid down his face as he perspired in the intense heat of the steam tunnels. He also attempted to use the glove bag method of removal, but the plastic bags used to isolate the asbestos during the procedure would melt on the hot pipes after the insulation was removed, spilling out the asbestos that was supposed to be safely contained in the bags. In 1991, Buckley, who had smoked heavily since he was seventeen, cut down his smoking to an average of one cigarette a day.

After learning of the asbestos in the insulation, the pipe fitters wrangled with Metro–North over the issue of safety. They also contacted the White Lung Association, an advocacy group for victims of asbestos exposure, to inform themselves about the hazards of asbestos. When their complaints to Metro–North management went unresolved, the workers contacted the Office of the New York State Attorney General, which investigated Metro–North in conjunction with the Inspector General of the Metropolitan Transit Authority. Because he "wanted Metro–North to be held accountable for what they did," Buckley contacted a law firm to pursue a case against Metro–North, as did as many as 140 other asbestos-exposed workers. Buckley's case was set up as a "test case" for the claims of all of the workers.

Buckley's attorney referred him to the Mount Sinai Occupational and Environmental Health Clinic for a medical evaluation. He was examined by Dr. Steven Markowitz and Dr. William Nicholson, who both testified as experts at trial. The doctors noted that Buckley currently showed no signs of asbestos-related diseases, but explained that the latency period for these diseases is not less than ten years and commonly ranges between 20–40 years. The doctors stated that Buckley was exposed to extremely high levels of asbestos as a pipe fitter for Metro–North, and agreed that, as a result of the asbestos exposure, Buckley suffered an increased risk of dying from an asbestos-related cancer. Dr. Markowitz characterized the increased risk as "significant," and, when pressed, quantified the increased risk as one to three percent. Dr. Nicholson quantified the increased risk as one to five percent, and stated that in his opinion there was a reasonable scientific basis to fear that Buckley will develop an asbestos-related cancer. Dr. Markowitz further noted that Buckley suffers a ten percent higher risk of developing scarring of the lining of the lungs due to on-the-job asbestos exposure.

Dr. Markowitz pointed out that Buckley's exposure could not be documented by x-ray until scarring developed, and a biopsy of the lungs could not be conducted because live tissue samples are not performed until disease has developed. In Dr. Markowitz's opinion, though, while working with the dry, chalky insulation, Buckley inhaled a great deal of thin, needle-like asbestos fibers that have lodged in Buckley's lungs and could create grave health problems later in life. He recommended that Buckley continue to be medically monitored for future signs of asbestos-related diseases, noting that early detection of some of these diseases, such as lung cancer, could improve Buckley's prognosis.

Buckley testified that he is fearful of developing an asbestos-related disease. He is angry at Metro–North and no longer trusts his employer to provide a safe workplace. He said that because of the asbestos exposure he worries about his future, becomes upset when he sees media reports about asbestos, and is overprotective of his young son. He has not, however, undergone any psychiatric treatment for his fears. As he stated, "[w]hat is a psychiatrist going to do for me? What is he going to tell me? I am not going to die? Is he going to tell me not to worry about it?"

After denying Metro–North's motion to dismiss, the district court directed that the case proceed to trial. See *Giammona v. Metro–North Commuter R.R.,* 750 F.Supp. 662 (S.D.N.Y.1990). In 1994, Buckley became the test plaintiff for the claims of all the exposed employees, and a jury trial commenced in February 1995. Because Metro–North conceded negligence, only the issues of causation and damages were placed before the jury. At the close of Buckley's case, and before Metro–North commenced its case, Metro–North filed a motion for judgment as

a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The court granted Metro–North's motion and dismissed the jury.

## DISCUSSION

Buckley contends the district court erred when it entered a judgment as a matter of law in favor of Metro–North at the close of Buckley's case. He asserts that his claim of negligent infliction of emotional distress and his claim for medical monitoring costs should have been submitted to the jury.

▆▆▆▆ A district court may grant a judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 only if no reasonable jury could find for the non-moving party. *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993). There must be "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Id.* (quoting *Mattivi v. South African Marine Corp., "Huguenot,"* 618 F.2d 163, 168 (2d Cir.1980)). In examining a motion for judgment as a matter of law, the court "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." *Purgess*, 33 F.3d at 140.

▆▆▆▆ In reviewing a judgment as a matter of law, we apply the same standard as the district court. *In re Joint Eastern & Southern Dist. Asbestos Litigation*, 52 F.3d 1124, 1131 (2d Cir.1995). Here, we must determine whether the district court correctly concluded that no reasonable jury could have found for Buckley on his claim of negligent infliction of emotional distress under FELA.

Section 1 of FELA, 45 U.S.C. § 51 (1994), states:

Every common carrier by railroad while engaging in commerce ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier....

Congress designed FELA as a "broad remedial statute" for railroad workers injured on the job because of employer negligence. *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561–62, 107 S.Ct. 1410, 1413–14, 94 L.Ed.2d 563 (1987). As the Supreme Court has noted, "[a] primary purpose of the Act was to eliminate a number of traditional defenses to tort liability and to facilitate recovery in meritorious cases." *Id.* at 561, 107 S.Ct. at 1413. However, "[o]nly to the extent of these explicit statutory alterations is FELA 'an avowed departure from the rules of the common law.'" *Consolidated Rail Corp. v. Gottshall*, —— U.S. ——, ——, 114 S.Ct. 2396, 2404, 129 L.Ed.2d 427 (1994) (quoting *Sinkler v. Missouri Pacific R.R. Co.*, 356 U.S. 326, 329, 78 S.Ct. 758, 762, 2 L.Ed.2d 799 (1958)). In other respects, the common law retains "great weight" in any judicial consideration. *Id.*

By the plain language of the statute, a "common carrier by railroad" is liable if one of its employee is injured due to the negligence of the common carrier. There is no dispute that Metro–North, a carrier by rails engaged in interstate commerce, employed Buckley. Furthermore, Metro–North has conceded negligence. Thus, this case turns upon whether Buckley's claim of emotional harm suffered as a result of Metro–North's negligence is an injury compensable under FELA.

## I. Negligent Infliction of Emotional Distress

In *Gottshall*, the Court stated that "[b]ecause FELA is silent on the issue of negligent infliction of emotional distress, common-law principles must play a significant role in [a court's] decision." *Id.* at ——, 114 S.Ct. at 2404. The common law in nearly every state, the Court found, allows plaintiffs to bring claims for negligent infliction of emotional distress and therefore such claims are cognizable under FELA. *Id.* at ——, 114 S.Ct. at 2405.

The Court recognized that because "[t]he incidence and severity of emotional injuries are ... more difficult to predict than those of typical physical injuries[,] ... negligent infliction of emotional distress [claims] hold[ ]

out the very real possibility of nearly infinite and unpredictable liability for defendants." *Id.* For this reason, the Court noted, the common law has sought to limit recovery for negligent infliction of emotional distress. Some jurisdictions allow recovery only to those whose emotional distress stemmed from a physical impact; others allow recovery to those who, though suffering no physical impact, were within the zone of danger; and still others allow recovery to those who, though not within the zone of danger, witnessed the death or severe injury of a relative. *See id.* at ——–——, 114 S.Ct. at 2406–07.

The Court analyzed these common-law restrictions on negligent infliction of emotional distress claims and adopted the zone of danger test as a proper limitation on recovery, balancing the concern for predictable liability with the broad remedial nature of FELA. The Court found that a negligent infliction of emotional distress claim may be brought by "those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." *Id.* at ——, ——, 114 S.Ct. at 2406, 2410.

Here, the district court found that Buckley did not fulfill the test for negligent infliction of emotional distress actions set forth in *Gottshall* because he did not suffer "sufficient impact with asbestos" to sustain a claim and "failed to prove that he had suffered a real emotional injury." We first address the district court's finding regarding physical impact and then turn to its finding regarding Buckley's emotional injury.

### A. Physical Impact

■ As we noted above, a plaintiff may state a claim for negligent infliction of emotional distress only if the plaintiff suffers a physical impact or the defendant's conduct "threatens [the plaintiff] imminently with physical impact"—the zone of danger test. *Gottshall* at ——, 114 S.Ct. at 2410.

■ We disagree with the district court's finding that Buckley did not suffer "sufficient impact with asbestos" to sustain a claim for negligent infliction of emotional distress. We hold that the district court erred in granting Metro–North a judgment as a matter of law because, from the evidence presented at trial, a reasonable jury could conclude that Buckley suffered a physical impact with asbestos.[1]

There is ample evidence in the record that the asbestos dust coated Buckley's skin and clothes, entering his nose, eyes, and mouth. Indeed, he could actually taste the chalky insulation material. When viewed in the light most favorable to Buckley, the evidence shows that he suffered a massive exposure to asbestos.[2] One need only visualize the image evoked by the pipe fitters' nickname—"the snowmen of Grand Central"—to understand the extent of Buckley's exposure to asbestos.

Furthermore, Buckley's expert witnesses testified that Buckley inhaled a large quantity of thin, needle-like asbestos fibers due to the work conditions imposed by Metro–North. When inhaled, asbestos fibers become imbedded in lung tissue and, according to Buckley's experts, cause subclinical changes to occur. Eventually, after ten to forty years, deadly and debilitating diseases may develop.

■ Metro–North argues that such exposure does not constitute an impact unless clinical signs of asbestos-related disease develop. Though both experts testified that Buckley's lungs had suffered subclinical

---

**1.** Buckley does not claim damages for increased *risk* of developing disease. In order to recover for an increased risk of disease, as opposed to negligent infliction of emotional distress based upon fear of disease, a plaintiff must show a physical impact and a probability that the disease will actually develop in the future. *See Hagerty v. L & L Marine Services, Inc.*, 788 F.2d 315, 319–20 (5th Cir.1986), *modified*, 797 F.2d 256 (5th Cir.1986). The evidence in this case would not support such a claim, because Buckley can-

not demonstrate a probability that he will develop an asbestos-related disease.

**2.** We do not believe that Buckley's claim should be defeated because he cannot quantify the amount of asbestos to which he was exposed. The reason no tests of asbestos levels were performed during the period of exposure was that Metro–North did not wish to disclose the presence of asbestos and therefore did not conduct any such tests.

changes, they admitted that Buckley had yet to display any verifiable clinical signs of asbestos exposure. However, the evidence Buckley presented showed that the absence of clinically verifiable proof is not dispositive. Given the strong evidence of massive exposure and the expert testimony regarding the likelihood of inhalation and its effect, we think a reasonable jury could find that Buckley suffered a physical impact from large amounts of asbestos fibers despite the lack of clinical proof of asbestos exposure. We cannot find as a matter of law that Buckley's injuries are not genuine simply because they are subcellular. The effect of asbestos in the lungs is a subtle, complex matter. It is for the jury, assisted by expert testimony, to determine whether Buckley has suffered present harm.

Our recent decision in *Marchica v. Long Island R.R. Co.*, 31 F.3d 1197 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 727, 130 L.Ed.2d 631 (1995), supports our conclusion that a reasonable jury could find that Buckley sustained a physical impact from his exposure to asbestos. In *Marchica*, we found that a railroad worker suffered a physical impact sufficient to recover for fear of contracting the AIDS virus when a discarded hypodermic needle stabbed the worker's hand while he was cleaning up an area of a railroad station notorious as a haven for drug users. *Id.* at 1206. We held that, even though it was never determined that the AIDS virus was present in the needle, such an injury "would cause a reasonable person to develop a fear of AIDS." *Id.* We noted that "[h]ad Marchica merely touched the discarded needle and become concerned about the possibility of developing AIDS, the case would stand on a very different footing." *Id.* at 1204. The distinction between a stab wound and a touch rests upon the method by which the AIDS virus is transmitted. The AIDS virus cannot be contracted simply by touching: penetration and contact with body fluid is required. A fear of developing AIDS absent such contact would be unreasonable.

Similarly, the fear of developing an asbestos-related disease from an incidental contact with asbestos would be unreasonable. Asbestos, as the evidence at trial showed, exists in small quantities in the air we breathe each day and such low-level contacts do not in any way affect the vast majority of people. Buckley, however, does not claim that his fear arises from normal contact with asbestos in the ambient air. Rather, as Buckley's counsel explained, Buckley's fear stems from "exposure to hazardous amounts of asbestos for an average of one hour per day while actual[ly] removal[ing], handling and working [with] asbestos insulation ... during the period from June of 1985 to June of 1988." Buckley offered evidence that such an exposure causes a measurable increase in the possibility of his developing asbestos-related disease. Just like the needle puncture in *Marchica*, Buckley's three years of daily contact with the cancer-causing substance—contact that from time to time left him covered from head to toe in asbestos dust—constitutes a physical impact that would lead a reasonable person to fear asbestos-related cancer.

For this reason, we reject the FELA cases finding that asbestos fiber inhalation cannot constitute an injury. *See Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir.), *cert. denied*, 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *Amendola v. Kansas City So. Ry. Co.*, 699 F.Supp. 1401, 1403 n. 3, 1410–11 (W.D.Mo.1988). While these cases express a concern over speculative or frivolous lawsuits, the *Marchica* case makes clear that the relevant inquiry is whether the impact would cause fear in a reasonable person. To make this determination, a jury must take into account the nature of the toxic substance, its method of transmission into the body, the extent of the exposure to the substance and how the disease develops in response to the presence of the toxic substance in the body. Given the evidence of Buckley's prolonged and pronounced exposure to asbestos, a jury may find that he suffered an impact that would cause fear in a reasonable person.

Metro–North urges us to follow those common law fear-of-disease cases holding that exposure to a carcinogen is not in and of itself enough to constitute a physical impact. It is true that many cases hold that a fear-of-disease plaintiff must prove both actual expo-

sure to a disease and a reasonable medical probability of later developing a disease. *See Marchica,* 31 F.3d at 1204 and cases cited therein; *Doner v. Ed Adams Contracting Inc.,* 208 A.D.2d 1072, 1072–73, 617 N.Y.S.2d 565, 566 (3d Dept.1994) (though plaintiff could prove actual exposure to asbestos, plaintiff failed to show he was likely to contract a disease and thus could not prevail on emotional distress claim). Other courts insist a plaintiff prove the exposure caused a present physical injury, that a future disease will likely develop, or that the emotional injury has manifested itself physically. *See Marchica,* 31 F.3d at 1204 and cases cited therein; *In re Hawaii Federal Asbestos Cases,* 734 F.Supp. 1563, 1569–70 (D.Haw. 1990) (fear of asbestos disease not rational unless plaintiff experiences functional impairment); *Burns v. Jaquays Mining Corp.,* 156 Ariz. 375, 378, 752 P.2d 28, 31 (Ct.App.1987) (no cause of action for fear of disease absent bodily injury); *Eagle–Picher Industries, Inc. v. Cox,* 481 So.2d 517, 527–28 (Fla.Dist.Ct. App.1985) (same).

As we noted in *Marchica,* however, such cases are inapposite when, as here, a plaintiff's emotional distress results from an actual physical impact or injury. *See Marchica,* 31 F.3d at 1204.[3] Furthermore, many courts have found that under certain circumstances exposure to asbestos or other disease-causing agents may constitute an impact sufficient to sustain a claim for fear of disease. *See, e.g., Hagerty,* 788 F.2d at 318 n. 1 (seaman soaked with toxic chemicals suffered a "physical injury from the drenching which constitutes an impact"); *Wetherill v. University of Chicago,* 565 F.Supp. 1553, 1560 (N.D.Ill.1983) (prenatal exposure to DES is a physical impact); *Lavelle v. Owens–Corning Fiberglas Corp.,* 30 Ohio Misc.2d 11, 14, 507 N.E.2d 476, 480 (Com.Pl.1987) (exposure to asbestos while working with insulation is a physical contact sufficient to allow fear of cancer claim to proceed). We choose to follow these cases and hold that a reasonable jury could find that Buckley suffered a physical impact.

**3.** The terms "impact" and "injury" were used interchangeably by the *Marchica* court to de-

We decline to narrow our view of physical impact in order to avoid the flood of litigation that Metro–North claims we will unleash by this decision. First, "a more flexible view" of physical impact is "most consistent with FELA's remedial nature." *Marchica,* 31 F.3d at 1206. Second, only a narrow class of plaintiffs may sue under FELA, *see Gottshall,* —— U.S. at ——, 114 S.Ct. at 2412 (Ginsburg, *J.,* dissenting), and FELA protects this group of plaintiffs from the negligent acts of employers to a greater extent than the plaintiffs would be protected at common law. Third, even within the narrow class of FELA plaintiffs, Buckley and the other "snowmen" present what we believe is an unusual case, as Buckley's exposure to ·asbestos was massive, lengthy, and tangible. Finally, Metro–North has admitted that it negligently allowed the pipe fitters to perform their duties without any knowledge on their part of the presence of asbestos or any training in its proper handling. We do not believe that the magnitude of Metro–North's wrong should limit the damages awarded against it. Thus, taking all inferences in favor· of Buckley, we find that a jury, presented with the evidence in this case, may find that Buckley suffered an impact that would cause fear in a reasonable person.

## B. Emotional Injury

Even if a plaintiff suffers a physical impact that would cause fear in a reasonable person, the plaintiff will not be permitted to recover unless he or she actually suffers an emotional injury as a result of the physical impact. The district court held that no reasonable jury would find that Buckley suffered emotional distress. Because the district court believed that Buckley offered no corroborating evidence of his emotional distress, and because Buckley continued to smoke cigarettes after learning that smoking increases the risk to those exposed to asbestos, the court held that Buckley's claimed emotional distress was not serious enough to be compensable.

scribe the needle prick suffered by Marchica.

■ Though a plaintiff need not present medical proof of emotional distress, some *objective* proof apart from plaintiff's testimony must be offered in order for a jury to determine that the plaintiff suffered real emotional injury. *Miner v. City of Glens Falls,* 999 F.2d 655, 663 (2d Cir.1993). We disagree with the district court that there is a complete lack of objective proof in this case. Buckley testified that because of his fear and anger, he complained first to his supervisors and then to the Metropolitan Transit Authority Inspector General ("I.G.") about the asbestos in the tunnels. The district court said Buckley failed to corroborate these complaints, but one worker who testified, Gregory Peck, stated that "we went to the I.G." when asked on cross-examination how he found out that "everything that [Metro–North] did was wrong." In addition, the joint report issued by the I.G. and the New York State Attorney General's Office, admitted into evidence, detailed the workers' complaints to supervisors and investigative bodies. This evidence, though slim, may provide substantiation of Buckley's claim.

■ Metro–North urges that regardless of whether Buckley provided any objective proof of emotional distress, he has not suffered emotional injury severe enough to sustain his claim. To permit an award for emotional distress arising out of a fear of cancer, a plaintiff must "introduce evidence of his particular fears with some specificity" and "as a threshold matter, present evidence of his particular fear of developing cancerous conditions." *Smith v. A.C. & S., Inc.,* 843 F.2d 854, 858–59 (5th Cir.1988). Buckley's testimony about his anger and fear of dying satisfies this burden. It appears from our review of case law that emotional distress must be "severe" only when a plaintiff has not suffered a physical impact. In such a case, the severity of the emotional distress serves to guarantee the genuineness of the claim. *See Lacy v. Cooper Hosp./Univ. Med. Ctr.,* 745 F.Supp. 1029, 1035–36 (D.N.J.1990); *Lavelle,* 30 Ohio Misc.2d at 14–15, 507 N.E.2d at 480–81; *Restatement (Second) of Torts* § 436A (1965); *compare Restatement (Second)* § 46 (to prove *intentional* infliction of emotional distress, plaintiff's emotional distress must be "so severe that no reason-able [person] could be expected to endure it"). Here, as we discussed above, a reasonable jury could find that Buckley has suffered a physical impact. Buckley is therefore entitled to all damages flowing from the impact, including his reasonable emotional distress, so long as the jury finds based upon Buckley's testimony and objective evidence that Buckley actually suffers from the fear and anger he claims.

We realize that the evidence of Buckley's emotional distress is not overwhelming. He does not suffer the sort of severe distress claimed by the plaintiff in *Marchica,* 31 F.3d at 1201, and there is not an abundance of evidence corroborating his claims. However, we do not believe that a jury need rely only upon "sheer surmise and conjecture," *Samuels,* 992 F.2d at 14, in order to find Buckley suffered emotional distress. Therefore, we find that the district court erred in granting Metro–North a judgment as a matter of law on Buckley's negligent infliction of emotional distress claim.

## II. Medical Monitoring Costs

■ As a separate claim, Buckley seeks to recover for the cost of future medical monitoring. The district court failed to address this claim at all in its judgment as a matter of law in favor of Metro–North. We find that medical monitoring costs are a reasonable basis for an award of damages in this case. We believe that the evidence presented by Buckley could convince a reasonable jury to grant medical monitoring damages.

Dr. Markowitz testified that because of Buckley's exposure to asbestos, he is at an increased risk of developing an asbestos-related disease which will peak between the ages of fifty and sixty-five. Dr. Markowitz stated that because of this risk, Buckley should be provided with present and future medical monitoring in order to detect and treat the diseases as they may arise, including an annual medical exam with pulmonary function tests and chest x-rays. Beginning at age 45, Buckley should also undergo a sigmoidoscopy and stool tests every other year. Dr. Markowitz estimated the annualized cost of these tests at $950.00.

It is hornbook law that a plaintiff may recover reasonable past and future medical expenses incurred as a result of an injury. *See* Charles T. McCormick, *Handbook on the Law of Damages* § 90 (1935). We believe that Buckley should be compensated for such medical monitoring as is reasonably necessary according to contemporary medical principles applied by physicians experienced in the diagnosis and treatment of asbestos diseases. We agree with a number of other courts that such costs are

> a compensable item of damages where the proofs demonstrate, through reliable expert testimony predicated upon the significance and extent of exposure ... the toxicity of [asbestos], the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, ... surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary.

*Ayers v. Township of Jackson,* 106 N.J. 557, 606, 525 A.2d 287, 312 (1987). We find that Buckley may recover such costs despite the fact that he has yet to suffer an asbestos-related disease. As one court has noted, "the appropriate inquiry is not whether it is reasonably probable that plaintiffs will suffer harm in the future, but rather whether medical monitoring is ... necessary in order to diagnose properly the warning signs of disease." *In re Paoli .R.R. Yard PCB Litigation (Paoli I),* 916 F.2d 829, 851 (3d Cir. 1990), *cert. denied,* 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991). *See also Gibbs v. E.I. DuPont De Nemours & Co., Inc.,* 876 F.Supp. 475, 478 (W.D.N.Y.1995) (citing *Paoli I* with approval); *Gerardi v. Nuclear Utility Services, Inc.,* 149 Misc.2d 657, 659, 566 N.Y.S.2d 1002, 1004 (Sup.Ct.1991) (defendant liable for medical monitoring expenses incurred by plaintiff due to "invasion of the body by toxic substances through negligent exposure"); *Askey v. Occidental Chemical Corp.,* 102 A.D.2d 130, 137, 477 N.Y.S.2d 242, 247 (4th Dept.1984) (medical monitoring costs recoverable if plaintiff can establish to a reasonable degree of medical certainty that costs are "reasonably anticipated"); *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 1006–07, 25 Cal.Rptr.2d 550, 863 P.2d 795,

822–23 (1993) (even in the absence of physical injury, reasonably certain medical monitoring costs may be recovered). Given the expert testimony in this case regarding impact, increased risk, and the necessity of monitoring, a reasonable jury could award Buckley medical monitoring costs.

Any award should be limited to costs incurred as a direct result of Buckley's asbestos exposure, rather than as a result of his history of smoking. We agree with the Third Circuit that a plaintiff must:

> prove that by reason of the exposure to the toxic substance caused by the defendant's negligence, a reasonable physician would prescribe for her or him a monitoring regime different than the one that would have been prescribed in the absence of that particular exposure. This is because under this cause of action, a plaintiff may recover only if the defendant's wrongful acts increased the plaintiff's incremental risk of incurring the harm produced by the toxic substance enough to warrant a change in the medical monitoring that otherwise would be prescribed for that plaintiff.

*In re Paoli R.R. Yard PCB Litigation (Paoli II),* 35 F.3d 717, 788 (3d Cir.1994) (quoting *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970, 980 (Utah 1993) (citations omitted)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). Therefore, a jury may only award to Buckley damages for that medical monitoring which is necessary because of his exposure to asbestos.

Competent expert testimony in this case established both that Buckley suffered a substantial impact from asbestos that has significantly increased his risk of contracting an asbestos-related disease and that Buckley should receive medical monitoring in order to ensure early detection and cure of any asbestos-related disease he develops. The costs of such tests are a traditional element of tort damages, and a reasonable jury may award them to Buckley in this case.

## CONCLUSION

For the reasons stated above, we vacate the judgment as a matter of law entered in

favor of Metro–North and remand this case to the district court for a jury trial.