385 F.3d 159
 FIRST CAPITAL ASSET MANAGEMENT, INC. and Willem Oost-Lievense, Plaintiffs-Appellants-Cross-Appellees,
v.
SATINWOOD, INC., Sphinx Rock, N.V., Ahmed Vahabzadeh, Sohrab Vahabzadeh, Afiwa, S.A., Afsar Vahabzadeh, Savco, S.A., and the Estate of Soleyman Vahabzadeh, Defendants-Appellees-Cross-Appellants,
Brickellbush, Inc., Manco, Inc., Manou Failly, Cimbalo Investments, B.V., Sotar Investments, B.V., Jens Schlegelmilch, Youssef Vahabzadeh, Peninsula Appreciation, Inc., North American Consortium, Inc., Iradj Vahabzadeh, and John Does 1 Through 20, who are the beneficial owners of Brickellbush, Inc., Satinwood, Inc. and Sphinx Rock, N.V. and other persons who may be interested in this action and who are presently unknown to plaintiffs, Defendants.
 Docket No. 03-7897(L).
 Docket No. 03-7956(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: May 18, 2004.
 Decided: September 27, 2004.
 
 Appeal from the United States District Court for the Southern District of New York, Lewis A. Kaplan, J. COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Eric W. Berry, New York, N.Y., for Plaintiffs-Appellants-Cross-Appellees.
 Russell P. McRory, McRory and McRory, P.L.L.C., Garden City, N.Y., for Defendants-Appellees-Cross-Appellants.
 Before: MINER and KATZMANN, Circuit Judges, and TSOUCALAS, Senior Judge.*
 MINER, Circuit Judge.
 
 
 1
 Plaintiffs-appellants-cross-appellees, First Capital Asset Management, Inc. ("FCAM") and Willem Oost-Lievense ("Oost-Lievense") (collectively, "Plaintiffs"), appeal from a final judgment entered in the United States District Court for the Southern District of New York (Kaplan, J.) dismissing Plaintiffs' RICO conspiracy and substantive RICO claims and declining to exercise supplemental jurisdiction over Plaintiffs' remaining, state-law, claims. On appeal, Plaintiffs contend that the District Court erred in concluding that Plaintiffs failed to plead a pattern of racketeering activity and in various other respects. In their "protective" cross-appeal, defendants-appellees-cross-appellants, Satinwood, Inc. ("Satinwood"), Sphinx Rock, N.V. ("Sphinx Rock"), Ahmed Vahabzadeh ("Ahmed"), Sohrab Vahabzadeh ("Sohrab"), AFIWA, S.A. ("AFIWA"), Afsar Vahabzadeh ("Afsar"), Savco, S.A. ("Savco"), and the Estate of Soleyman Vahabzadeh ("Soleyman's Estate") (collectively, "Defendants"), assert that the District Court erred in making certain determinations relating to Plaintiffs' substantive RICO claims and in holding that pendent party jurisdiction existed over certain defendants.
 
 
 2
 We agree with the District Court that Plaintiffs failed to plead a racketeering pattern, and thus we conclude that their substantive RICO claims were properly dismissed. And because Plaintiffs' RICO conspiracy claims are entirely dependent on their substantive RICO claims, we also concur in the District Court's dismissal of the RICO conspiracy claims. Further, we find that the District Court did not abuse its discretion in declining to exercise supplemental jurisdiction over the remaining claims. Accordingly, we affirm the judgment of the District Court in all respects.[1]
 
 BACKGROUND
 
 3
 Familiarity with the facts giving rise to this appeal is assumed, as those facts are set forth in the District Court's comprehensive published opinions. See First Capital Asset Mgmt., Inc., v. Brickelbush, Inc., 150 F.Supp.2d 624 (S.D.N.Y.2001) [hereinafter "FCAM I"]; First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 218 F.Supp.2d 369 (S.D.N.Y.2002) [hereinafter "FCAM II"]; First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 219 F.Supp.2d 576 (S.D.N.Y.2002) [hereinafter "FCAM III"]. We relate below only those facts and proceedings that are relevant to the present appeals.
 
 I. State Court Proceedings
 
 4
 In October 1993, FCAM entered into a stock-purchase agreement (the "SPA") with Sohrab and his companies, North American Consortium, Inc. ("NACI") and N.A. Partners, L.P. ("NAP"). Sohrab was to pay FCAM $4.5 million in return for an interest in a new Delaware corporation called First Capital Corp. The SPA also provided that Oost-Lievense would become First Capital Corp.'s first CEO. Based on that agreement, Oost-Lievense resigned from his position as president of ABN AMRO Securities, Inc.
 
 
 5
 Shortly thereafter, Sohrab, NACI, and NAP breached the SPA, leaving FCAM without the promised $4.5 million and Oost-Lievense without a job. FCAM sued Sohrab, NACI, and NAP in Texas for breach of contract. The action was commenced in December 1993, dismissed on the ground of forum non conveniens, and subsequently recommenced in New York. In February 1997, the New York State Supreme Court granted summary judgment for FCAM against NACI and NAP and awarded damages of $4.5 million plus interest, but found that Sohrab himself was not personally liable.[1] NACI and NAP were shell companies, however, with no discernible assets to satisfy the judgment. FCAM therefore commenced a proceeding in New York State Supreme Court, petitioning the court, pursuant to N.Y. C.P.L.R. article 52, to enforce against Soleyman's Estate and Sohrab (under alter ego theories) the prior judgment against NACI and NAP.[2] The state court dismissed the petition, but that dismissal was reversed as against Sohrab by the Appellate Division.[3] In June 2001, the New York Supreme Court entered judgment in favor of FCAM and against Sohrab for more than $5 million.[4]
 
 
 6
 Oost-Lievense, too, sued Sohrab, NACI, and NAP in federal court — for breach of the employment agreement incorporated in the SPA (the "Oost-Lievense Action").[5] Eventually, without a trial, the defendants in that action stipulated to damages, and judgment was entered in Oost-Lievense's favor.
 
 II. Federal Proceedings
 A. Sohrab's Bankruptcy
 
 7
 In July 1997, a few weeks before trial in the Oost-Lievense Action was scheduled to begin, Sohrab filed a Chapter 7 bankruptcy petition. FCAM and Oost-Lievense filed an adversary proceeding objecting to Sohrab's discharge under § 727 of the Bankruptcy Code (11 U.S.C. § 727) on the grounds of bankruptcy fraud and fraudulent conveyance (the "Adversary Proceeding"). In December 1999, after a trial, the bankruptcy court denied Sohrab's Chapter 7 petition for discharge on grounds of bankruptcy fraud.[6]
 
 B. FCAM I
 
 8
 In July 2000, Plaintiffs filed a complaint (the "Complaint") in the District Court alleging ten causes of action, two under RICO and the others under state law. The RICO counts — one substantive and one for conspiracy — were brought against Sohrab, his mother, his uncle Ahmed, and the Vahabzadeh family's Swiss lawyer, Jens Schlegelmilch ("Schlegelmilch"). The RICO claims arose from the allegedly unlawful actions of those four individuals and of numerous other Vahabzadeh family members and related entities — including Satinwood, Sphinx Rock, and Savco — allegedly controlled by the family and/or certain members of it. The civil RICO claims were the sole bases for federal jurisdiction.
 
 
 9
 Plaintiffs specifically alleged that Defendants' RICO violations and state-law fraudulent-conveyance violations prevented Plaintiffs from satisfying the outstanding judgments against Sohrab and his related companies. In particular, Plaintiffs alleged the following RICO predicate acts, which were primarily bankruptcy and mail frauds:
 
 
 10
 [x] In August 1995, Sohrab and Peninsula Appreciation, Inc. ("Peninsula"), allegedly Sohrab's alter ego, fraudulently conveyed their interests in a partnership to defendant Brickellbush, Inc. in contemplation of bankruptcy.
 
 
 11
 [x] In early 1997, Sohrab transferred property inherited from Soleyman to other family members, including Afsar. Schlegelmilch prepared the documents that effected the transfer.
 
 
 12
 [x] On July 17, 1997, Sohrab filed a materially false bankruptcy petition.
 
 
 13
 [x] On September 16, 1997, Sohrab made false statements under oath at the Bankruptcy Rule 2004 examination by his creditors.
 
 
 14
 [x] Ahmed and Schlegelmilch directed Soleyman's Estate's attorney to submit declarations to the bankruptcy court in February and March 1998 containing false statements about the contents of Soleyman's Estate and, in June 1998, Afsar and Soleyman's Estate directed the same attorney to submit a similar declaration.
 
 
 15
 [x] In March 1998, Afsar and Schlegelmilch submitted affidavits to the bankruptcy court making false claims about Soleyman's citizenship.
 
 
 16
 [x] On June 25, 1998, Sohrab submitted an affidavit to the bankruptcy court in which he falsely stated that he had searched for a complete copy of a trust agreement.
 
 
 17
 [x] In September 1998, Ahmed, AFIWA (at the direction of Ahmed), Afsar, and Schlegelmilch committed mail fraud by sending Sohrab correspondence claiming that they had no documents relevant to Soleyman's Estate.
 
 
 18
 [x] Sohrab gave false testimony about his inheritance at his bankruptcy trial in October 1999.
 
 
 19
 [x] From September 1997 to December 1999, Afsar "accessed" Sohrab's overseas accounts, transferring approximately $5000 per month from those accounts first into her accounts and then into Sohrab's domestic accounts. Ahmed also transferred money to Sohrab at least once, on October 3, 1998. Schlegelmilch, too, transferred money to Sohrab on at least two occasions — August 4 and November 3, 1998. And finally, Schlegelmilch and Ahmed paid Sohrab's legal fees — "including one payment in the amount of either $15,000 or $25,000" — in September 1999.
 
 
 20
 Satinwood, Sphinx Rock, Ahmed, Savco, and Soleyman's Estate (collectively, the "Moving Defendants") moved to dismiss the Complaint pursuant to: Fed.R.Civ.P. 12(b)(6), for failure to state a claim; Fed.R.Civ.P. 9(b), on the ground that the predicate acts were not pleaded with sufficient particularity; and Fed.R.Civ.P. 12(b)(1), for lack of standing and subject matter jurisdiction. The Moving Defendants also moved to dismiss all claims against Afsar, Ahmed, and AFIWA under Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction. Defendants Brickellbush, Inc. ("Brickellbush"), Manou Failly, and Youssef Vahabzadeh (collectively, the "Failly Defendants") moved to dismiss for lack of jurisdiction, failure to plead fraud with specificity, and failure to state a claim.
 
 
 21
 On July 19, 2001, in a twenty-page, published memorandum opinion, the District Court held that Plaintiffs had not sufficiently pled a pattern of racketeering activity. FCAM I, 150 F.Supp.2d at 633-36. The court analyzed the alleged predicate acts chronologically, first "examin[ing] the sufficiency of the chronologic outliers, specifically the August 1995 conveyances and the transfers of funds to Sohrab in 1998 and 1999." Id. at 631.
 
 
 22
 As to the first "outlier" predicate act, Plaintiffs alleged that, in August 1995, Sohrab and an alter ego had transferred their interests in a partnership for inadequate consideration and no consideration, respectively, in contemplation of bankruptcy. Id. at 631-33. Plaintiffs claimed that the transfer constituted fraud on Sohrab's part and, thus, was a RICO predicate. In the court's view, however, "[n]ot only [was] there a dearth of facts supporting such an inference, but several allegations undermine[d] it. The transfer predated the bankruptcy filing by two years and occurred before judgments were entered against Sohrab and his companies"; moreover, "other allegations that Sohrab made fraudulent conveyances in the same period ... [did] not allege that he made these in contemplation of bankruptcy, despite being contemporaneous." Id. at 632. Consequently, the court found that "the [C]omplaint offer[ed] no rational basis upon which to ground an inference that the August 1995 transfer was made in contemplation of bankruptcy[,] [and] contain[ed] only conclusory allegations of scienter without the necessary minimum factual basis." Id.
 
 
 23
 And as to the last "outlier" predicate act, Plaintiffs'"alleged that Ahmed, Afsar[,] and Schlegelmilch at various times in 1998 and 1999 violated 18 U.S.C. § 152(7) by receiving assets from Sohrab, a debtor intending to defeat the purpose of the Bankruptcy Code." Id. The court found those allegations, as well, to be vague and unpersuasive. The court noted that Plaintiffs had not alleged with any specificity when assets were transferred from Sohrab: "Although the [C]omplaint detail[ed] when the money was transferred to Sohrab from the family members and Schlegelmilch, it [was] silent on when the money was received from the debtor — the essence of the predicate act." Id. at 632-33 (emphasis added). The court noted "that Soleyman's other children routinely [had] received gifts amounting to hundreds of thousands of dollars [per] year," and found that this tended to "undermine an[y] inference of fraudulent intent" underlying the 1998 and 1999 transfers. Id. at 633. Thus, the court concluded that Plaintiffs had failed to plead with sufficient particularity the predicate acts that were alleged to have occurred in 1998 and 1999, which constituted the chronological endpoints in the alleged pattern. Id.
 
 
 24
 Having "eliminated" all of "the alleged predicate acts at the temporal extremes," id., the District Court proceeded to analyze the remaining alleged predicate acts to determine if they constituted a pattern. Examining open-ended continuity first, the court, in a relatively straightforward, "inherently fact bound" inquiry, found that Plaintiffs had failed to demonstrate "that the predicate acts were the regular way of operating [the alleged enterprise], or that the nature of the predicate acts themselves implie [d] a threat of continued criminal activity." Id. at 633-34 (footnotes and internal quotation marks omitted). Accordingly, the court determined that the remaining alleged predicates did not constitute a pattern of open-ended continuity.
 
 
 25
 Next, focusing primarily on the length of time over which the remaining alleged predicate acts had occurred, the court examined whether the purported pattern expressed closed-ended continuity. The court found that "Schlegelmilch's and Afsar's activities all revolved around a single scheme to avoid Sohrab's bankruptcy creditors," and that these acts were "limited" in duration, variety, and number — with Schlegelmilch's acts "essentially amount [ing] to drafting and submitting documents and affidavits in the various legal actions"; and Afsar's acts amounting to making "false statements and accept [ing] the inheritance." Id. at 635. Further, the court noted that, once the chronological outlier acts were eliminated (for deficiencies in pleading, as detailed above), all of the remaining alleged predicate acts of Ahmed, Afsar, and Schlegelmilch were performed over less than a two-year span of time. Id. This was a critical finding in light of the District Court's interpretation of the law of this Circuit — that predicate acts occurring over less than a two-year period may not be deemed a pattern. See id. at 634-35. Accordingly, with respect to Afsar, Ahmed, and Schlegelmilch, the District Court held that Plaintiffs had failed to allege a pattern of closed-ended continuity. Id. at 635.
 
 
 26
 The court then examined the predicate acts allegedly committed by Sohrab. Examining the totality of the circumstances surrounding these acts, the court found that Sohrab had allegedly taken part "in a single scheme through acts limited essentially to false statements to the Bankruptcy Court and transfer of his inheritance." Id. at 636. The District Court took note of our teaching that courts must "take care to ensure that plaintiff[s] [do] not artificially fragment[ ] a singular act into multiple acts simply to invoke RICO." Id. (internal quotation marks omitted) (citing Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91, 97-98 (2d Cir.1997)). Mindful of this admonition, the District Court held that, "[i]n the circumstances, taking the allegations of the [C]omplaint as true, [P]laintiffs have not alleged facts sufficient to establish a pattern." Id.
 
 
 27
 In light of these findings, the District Court dismissed the substantive RICO claims in the Complaint, holding that the alleged acts did not "rise[ ] to the level of a pattern of racketeering activity." Id. at 635. The court also found that "[b]ecause [P]laintiffs' substantive RICO claims [were] infirm, there [was] no basis for a claim of [RICO] conspiracy." FCAM I, 150 F.Supp.2d at 636. And finally, the court declined to exercise supplemental jurisdiction over the state-law claims in the absence of RICO-based federal jurisdiction. In sum, the Complaint was dismissed in its entirety as against all defendants.
 
 C. FCAM II
 
 28
 In August 2001, the District Court granted Plaintiffs leave to amend the Complaint,[7] and, in September 2001, Plaintiffs filed an amended complaint (the "Amended Complaint"), asserting eight claims for relief:
 
 
 29
 Counts One through Four [were] New York law fraudulent conveyance claims against Sohrab, Ahmed, Afsar, Soleyman's Estate, Sphinx Rock, Satinwood, Peninsula, and "John Does 1-20." Count Five [was] a substantive RICO claim under 18 U.S.C. § 1962(c) against Sohrab and Afsar. Count Six [was] a RICO conspiracy claim under 18 U.S.C. § 1962(d) against Sohrab, Ahmed, and Afsar. Count Seven [was] a reverse corporate veil piercing and alter ego liability claim against AFIWA. Count Eight [was] a successor liability, common corporate enterprise, and alter ego liability claim against Savco.
 
 
 30
 FCAM II, 218 F.Supp.2d at 377.
 
 
 31
 By the time of the filing of the Amended Complaint, certain parties to the original action were no longer involved in the case.[8] Of the remaining defendants, all but Sohrab — i.e., Afsar and the Moving Defendants — moved for an order dismissing: (1) the Amended Complaint against the Moving Defendants for failure to state a claim pursuant to Rule 12(b)(6) or, in the alternative, pursuant to Rule 12(b)(1) for lack of standing and subject matter jurisdiction; and (2) all claims against Afsar, Ahmed, and AFIWA, pursuant to Rule 12(b)(2) for lack of personal jurisdiction. Id. at 377. On July 29, 2002, the District Court issued a fifty-three-page, published memorandum opinion — FCAM II — addressing this motion.
 
 
 32
 The District Court first analyzed whether Plaintiffs had standing to assert a civil RICO claim. The court determined that Plaintiffs' allegations of injury could be broken down into two categories — their inability to collect the judgments they had secured against Sohrab and his companies (the "Lost Debt" injuries), and the cost of pursuing their objections to Sohrab's bankruptcy discharge (the "Legal Fees" injuries).[9] Id. at 379-80. With respect to the Lost Debt injuries, the court found that "[P]laintiffs ha [d] commenced and prosecuted to judgment or settlement five lawsuits against transferees of Sohrab's allegedly fraudulently conveyed assets." Id. at 381. The court concluded that, because Plaintiffs'"efforts, as evidenced by the state law claims in this case, [were] continuing and [had been met] with varying degrees of success," that Plaintiffs had "neither ... alleged nor offered any proof that the collection of the debt ha[d] been frustrated as a proximate consequence of any of the [D]efendants' alleged predicate acts." Id. Accordingly, the court held that Plaintiffs lacked standing to pursue a RICO claim for Lost Debt injuries.[10] See id.
 
 
 33
 With respect to Plaintiffs' alleged Legal Fees injuries, the court found that, "[a]mong the scores of predicate acts allegedly committed by Sohrab, the following [were] particularly relevant":
 
 
 34
 (1) on July 17, 1997, Sohrab filed a materially false bankruptcy petition in violation of 18 U.S.C. § 152(2); (2) on July 17, 1997, Sohrab transferred $95,000 he held in an account at Bank of New York in the name of Vahabzadeh & Co. to an account at Credit Suisse in Zurich controlled by his wife Ninni's brother, Ali Ladjevardi, in violation of 18 U.S.C. § 152(1) and 18 U.S.C. § 152(7); (3) on May 13, 1997, Sohrab and Ninni executed a separation agreement in which Sohrab, without consideration, ostensibly waived a claim to an equitable distribution of ... marital property, in violation of 18 U.S.C. § 152(1) and 18 U.S.C. § 152(7); (4) on September 4, 1997, Sohrab made false statements concerning his family's financial affairs and his interest in Soleyman's Estate and in the Vahabzadeh family business at a meeting of his creditors, in violation of 18 U.S.C. § 152(3); and (5) on September 16, 1997, Sohrab made similar false statements under oath during an examination by his creditors conducted under Bankruptcy Rule 2004, in violation of 18 U.S.C. § 152(3).
 
 
 35
 Id. at 382-83 (footnotes omitted). The court found that there was "at least a genuine issue of fact regarding whether these predicate acts proximately caused [P]laintiffs to incur legal fees and other expenses in prosecuting their objections to Sohrab's bankruptcy petition in the ... [A]dversary [P]roceeding." Id. at 383. Thus, the court concluded, Plaintiffs had standing to pursue their substantive RICO claim against Sohrab for Legal Fees injuries.
 
 
 36
 With regard to Afsar, the court noted that Plaintiffs had alleged "that Afsar [had] committed the following predicate acts":
 
 
 37
 (1) at an unspecified time in early 1997, she received assets from Sohrab, which he purportedly inherited from Soleyman's Estate and transferred to her overseas, all in violation of 18 U.S.C. § 152(7); (2) on September 16, 1998, she falsely stated in a letter sent to Sohrab and intended for the bankruptcy court that she had no documents in her possession relating to Soleyman's Estate or the financial affairs of her late husband; (3) on March 24, 1998, as part of the [A]dversary [P]roceeding, she submitted an affidavit stating falsely that Soleyman had been an Iranian citizen and not a Swiss citizen, presumably in violation of 18 U.S.C. § 152(3); (4) she caused Russell McRory, in his capacity as her attorney, to submit a declaration ... to the bankruptcy court, dated March 4, 1998, in which he stated that Soleyman, at the time of his death, owned no bank, brokerage, investment, or other type of account, presumably in violation of 18 U.S.C. § 152(3); (5) she caused Mr. McRory, in his capacity as her attorney, to submit a declaration to the bankruptcy court, dated June 12, 1998, in which he stated that Schlegelmilch had informed him that there were no assets in Soleyman's Estate at the time of his death beyond personal effects, furnishings in his home[,] and [two] non-working automobiles, both over [twenty] years old, presumably in violation of 18 U.S.C. § 152(3); and (6) on various dates between 1997 and 1999, she sent money to Sohrab, allegedly out of assets unlawfully transferred to her in 1997 by Sohrab, in violation 18 U.S.C. § 152(7).
 
 
 38
 Id. at 384-85 (footnotes omitted). In analyzing the above-listed predicate acts, the court divided them into two groups: the "Adversary Proceeding Predicate Acts" (including predicate acts (2) through (5)) and the "Transfer Predicate Acts" (including predicate acts (1) and (6)). Id. at 385.
 
 
 39
 With regard to the Adversary Proceeding Predicate Acts, the court found that Plaintiffs had failed to show any injury thereby. The court noted that Plaintiffs had been charged a flat fee by their attorneys for the Adversary Proceeding and that all of the alleged acts associated with it were committed well after the commencement of that proceeding. Therefore, the court reasoned, any efforts on Afsar's part to delay or obstruct the Adversary Proceeding could not possibly have increased Plaintiffs' legal fees associated with that proceeding. Id. The court further found that the Transfer Predicate Acts had not been pled with sufficient particularity. The court noted that neither the Complaint nor the Amended Complaint — despite its having added "a mountain of new allegations asserting, on information and belief, that Soleyman [had] owned assets at the time of his death and that Sohrab [had] received an inheritance" — provided any detail as to when money had been received from Sohrab, or when or how any transfer(s) to Afsar had been accomplished. Id. at 386. The court, finding "[t]hese omissions [to be] particularly glaring because Afsar's receipt of Sohrab's assets in contemplation of his bankruptcy [was] the gravamen of the alleged predicate act," concluded that Plaintiffs did not have standing to seek Legal Fees injuries from Afsar in a substantive RICO claim. Id. at 386-87.
 
 
 40
 The court found, however, that Plaintiffs did have standing to assert a RICO conspiracy claim against Afsar, Sohrab, and Ahmed for Legal Fees injuries. The court found that "there [was] at least an issue of fact" regarding whether the predicate acts attributed to Sohrab "were taken in furtherance of a conspiracy formed by Sohrab, Ahmed, Afsar, and Schlegelmilch in Geneva, which had as its object `to transfer and conceal assets of Sohrab in contemplation of and during Sohrab's bankruptcy case.'" Id. at 384. Thus, concluded the court, "the Legal Fees injury flowing from Sohrab's predicate acts" conferred standing on Plaintiffs to pursue not only their substantive RICO claims for Legal Fees injuries against Sohrab, but a RICO conspiracy claim against Ahmed and Afsar arising from the alleged Legal Fees injuries as well. Id.
 
 
 41
 The District Court next performed a detailed analysis of whether it could exercise personal jurisdiction over Afsar, Ahmed, and AFIWA. Based on the Amended Complaint, affidavits, and documentary exhibits submitted by the parties, the court determined that it could not exercise personal jurisdiction over Afsar, Ahmed, or AFIWA with respect to either the substantive RICO claims or the RICO conspiracy claims. The court found, however, that pendent party jurisdiction existed over Ahmed and Soleyman's Estate on the state-law fraudulent conveyance claims. Id. at 401 & n. 165.
 
 
 42
 Notably, in FCAM II, the District Court declined to address the Moving Defendants' argument that the Amended Complaint should be dismissed as against them for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), and for failure to comply with Fed.R.Civ.P. 9(b). The court reasoned that, as the entirety of those arguments revolved around Plaintiffs' RICO claims, and all of the RICO claims against the Moving Defendants had been dismissed, their Rule 12(b)(6) and 9(b) arguments were moot. Id. at 403. Ultimately, the District Court in FCAM II dismissed (i) all claims against Afsar for lack of standing and lack of personal jurisdiction, (ii) all claims against AFIWA for lack of personal jurisdiction, and (iii) the RICO conspiracy claim against Ahmed for lack of personal jurisdiction. Id. at 404.
 
 D. FCAM III
 
 43
 Plaintiffs and Defendants filed "dueling" motions for reconsideration of the District Court's FCAM II decision. Plaintiffs challenged the court's earlier dismissal of certain claims on grounds of standing and ripeness.[11] Defendants, on the other hand, argued that the District Court should have considered their Rule 12(b)(6) and 9(b) arguments, as it had in the FCAM I decision; and that, to spare Defendants the effort of "defending state law claims in federal court solely by virtue of the continued pendency of the RICO claims against Sohrab," the court should have dismissed the Amended Complaint in its entirety. FCAM III, 219 F.Supp.2d at 580. The District Court agreed with Defendants. On September 11, 2002, the court issued a twenty-four page, published memorandum decision. Reconsidering its earlier decision not to reach the Moving Defendants' Rule 12(b)(6) and 9(b) arguments, and "adher[ing] to its prior ruling that [P]laintiffs' alleged [L]ost [D]ebt injury [did] not provide them with RICO standing," the court, upon reconsideration, determined all of Plaintiffs' RICO claims to be legally insufficient. Id. at 588.
 
 
 44
 The District Court initially focused on the sufficiency of Plaintiffs' allegations with respect to certain alleged fraudulent transfers by Sohrab in 1995 — the "Tiburon and Timberland transfers." Plaintiffs had attempted to cure the deficiencies in the Complaint by alleging the following additional facts in the Amended Complaint:
 
 
 45
 (a) Sohrab's wife, Ninni, revealed in a tape-recorded conversation on July 25, 1996 that one of Sohrab's companies would file for bankruptcy and that "Sohrab might file for bankruptcy" if First Capital was successful in its state court action; (b) Sohrab "was ... considering filing for bankruptcy" at the time he transferred approximately $360,000 to Soleyman in August 1995; and (c) in an amended counterclaim that Sohrab filed in the state court action on October 24, 1995, he revealed that he sold the Timberland and Tiburon interests because of First Capital's lawsuit and liquidated these interests for less than fair value.
 
 
 46
 Id. at 581-82 (footnotes omitted). The court was not persuaded. It held that "[P]laintiffs' conclusory allegations of scienter without a coherent factual basis [were] insufficient to meet Rule 9(b)'s requirements," and, therefore, that the Tiburon and Timberland transfers could not "be considered in evaluating Sohrab's pattern of racketeering activity." Id. at 583.
 
 
 47
 Next, the District Court analyzed in detail the patterns of RICO conduct that Plaintiffs had alleged on the parts of Sohrab and Afsar. The court acknowledged that Plaintiffs had sufficiently "alleged a pattern involving a single scheme of modest ... scope consisting of approximately ten predicate acts.... [that] spanned well over two years." Id. at 587. The court found, however, that "the chronology of events suggest[ed] sporadic bursts of activity at key points in time, such as in the months immediately preceding and following Sohrab's bankruptcy petition and certain hot spots during the [Adversary Proceeding], rather than sustained and continuous criminal activity over the whole time period." Id. Ultimately, the court "[was] not prepared to conclude that the specific racketeering activities [alleged by Plaintiffs] constitute[d] the sort of `long-term criminal conduct' that Congress sought to target in RICO." Id.
 
 
 48
 Accordingly, the court dismissed Plaintiffs' substantive RICO claims on the ground that "the alleged patterns of racketeering activity exhibit[ed] neither open-ended nor closed-ended continuity." Id. at 587-88. And because the District Court found that Plaintiffs alleged no "actionable violation of RICO," the court dismissed the RICO conspiracy claims as well. Id. at 588. Finally, the court declined to exercise supplemental jurisdiction over the fraudulent-conveyance and veil-piercing claims or over the defendants not named in the RICO counts. Id.
 
 
 49
 Thus, the Amended Complaint was dismissed in its entirety as against all defendants, and a judgment to that effect was entered on September 17, 2002. For reasons not relevant to this appeal, however, that judgment was not rendered final until August 1, 2003. This timely appeal and cross-appeal followed.
 
 DISCUSSION
 I. Standard of Review
 
 50
 The District Court dismissed Plaintiffs' RICO claims after finding that certain allegations had not been pled with sufficient particularity and that, disregarding those allegations, Plaintiffs had failed to state a claim. See generally FCAM III, 219 F.Supp.2d at 578-88. This Court applies a de novo standard of review to such a dismissal, accepting as true the Amended Complaint's factual allegations and drawing all inferences in Plaintiffs' favor. DeMuria v. Hawkes, 328 F.3d 704, 706 (2d Cir.2003); see Scutti Enters., LLC v. Park Place Entm't Corp., 322 F.3d 211, 214 (2d Cir.2003).
 
 
 51
 II. Substantive RICO and RICO Conspiracy Claims
 
 A. RICO Enterprise
 
 52
 The RICO statute makes it unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); see also United States v. Indelicato, 865 F.2d 1370, 1373 (2d Cir.1989) (en banc). "`Enterprise' is defined to `include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" Bankers Trust Co. v. Rhoades, 741 F.2d 511, 515 (2d Cir.1984) (quoting 18 U.S.C. § 1961(4)). The Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).[12]
 
 
 53
 In addition to individuals associated in fact, any legal entity may qualify as a RICO enterprise. See 18 U.S.C. §§ 1961(4), 1962(c). The enterprise must be separate from the pattern of racketeering activity, Turkette, 452 U.S. at 583, 101 S.Ct. 2524, and distinct from the person conducting the affairs of the enterprise, see Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161-62, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001); Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir.1994); accord Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 89 (2d Cir.1999). Thus, RICO requirements are most easily satisfied when the enterprise is a formal legal entity. See Bennett v. Berg, 685 F.2d 1053, 1060 (8th Cir.1982), adopted on reh'g en banc, 710 F.2d 1361, 1363-64 (8th Cir.1983); see also United States v. Blinder, 10 F.3d 1468, 1474 (9th Cir.1993). But legitimacy is by no means a prerequisite to a RICO enterprise. In perhaps its least developed form, an enterprise may be found where there is simply a "discrete economic association existing separately from the racketeering activity." United States v. Anderson, 626 F.2d 1358, 1372 (8th Cir.1980); see Turkette, 452 U.S. at 585, 101 S.Ct. 2524.
 
 
 54
 This Court, however, further requires that a nexus exist between the enterprise and the racketeering activity that is being conducted. See Indelicato, 865 F.2d at 1384. And "[f]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." First Nationwide Bank v. Gelt Funding Corp., 820 F.Supp. 89, 98 (S.D.N.Y.1993) (internal quotation marks omitted), aff'd, 27 F.3d 763 (2d Cir.1994); see also Moll v. U.S. Life Title Ins. Co. of N.Y., 654 F.Supp. 1012, 1031 (S.D.N.Y.1987) (citing cases).
 
 
 55
 In the Amended Complaint, Plaintiffs alleged three "association-in-fact enterprises." The first is the "Soleyman Entities Enterprise," allegedly consisting of Soleyman, as succeeded by Soleyman's Estate; Sohrab's Chapter 7 bankruptcy estate (the "Bankruptcy Estate"); AFIWA; SAVCO; Wastwater, N.V. ("Wastwater"); defendant Cimbalo Investments, B.V. ("Cimbalo"), as succeeded by defendant Sotar Investments, B.V. ("Sotar"); Zanda Management, Inc. ("Zanda"); and Brinslen Invest, S.A. ("Brinslen"). The second purported association-in-fact enterprise is the "Vahabzadeh Family Enterprise," allegedly consisting of Soleyman, as succeeded by Soleyman's Estate; AFIWA; Brinslen; Sohrab; the Bankruptcy Estate; Afsar; Ahmed; and Schlegelmilch. The third purported association-in-fact enterprise is the "Bankruptcy Estate Enterprise" (described in detail below).
 
 
 56
 We note that the Amended Complaint fails to make out any real distinction between the Soleyman Entities Enterprise and the Vahabzadeh Family Enterprise. There is considerable overlap between the members of these two purported enterprises — both include Soleyman, Soleyman's Estate, the Bankruptcy Estate, AFIWA, and Brinslen. The only distinction between the two enterprises seems to be that the Soleyman Estate Enterprise also include several entities allegedly owned by Soleyman at one time or another (i.e., Cimbalo, Zanda, Wastwater, and SAVCO); whereas the Vahabzadeh Family Enterprise also includes several individuals (i.e., Sohrab, Afsar, Ahmed, and Schelgelmilch). Further, the Amended Complaint essentially treats the two enterprises as one — for example, Plaintiffs allege that the two enterprises had the same background, structure, and composition. In any event, we discern no reason not to treat these two alleged enterprises as one and, therefore, in this opinion refer to them, collectively, as the "Vahabzadeh Enterprise."
 
 1. The Vahabzadeh Enterprise
 
 57
 The alleged illegal purpose of the Vahabzadeh Enterprise was to "conceal [ ] Sohrab's assets from his creditors, the bankruptcy court[,] and Sohrab's Chapter 7 Trustee." The Amended Complaint fails, however, to detail any course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves — a requirement in this Circuit. See First Nationwide, 820 F.Supp. at 98. Plaintiffs certainly have not advanced any factual allegations that the Vahabzadeh Enterprise was an "ongoing organization, formal or informal," or any "evidence that the various associates" of the alleged enterprise functioned "as a continuing unit." Turkette, 452 U.S. at 583, 101 S.Ct. 2524. Moreover, Plaintiffs have failed to provide us with any solid information regarding the "hierarchy, organization, and activities" of this alleged association-in-fact enterprise, United States v. Coonan, 938 F.2d 1553, 1560-61 (2d Cir.1991), from which we could fairly conclude that its "members functioned as a unit," Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F.Supp.2d 514, 539 (S.D.N.Y.2001). Thus, there is no basis to support the conclusion that the supposed constituent entities of the Vahabzadeh Enterprise were "associated together for a common purpose of engaging in a course of conduct." Turkette, 452 U.S. at 583, 101 S.Ct. 2524.
 
 
 58
 Moreover, Plaintiffs have both failed to allege a nexus between the Vahabzadeh Enterprise and the alleged RICO predicates and failed to explain each participant's role in the alleged course of fraudulent or illegal conduct. See Bernstein v. Misk, 948 F.Supp. 228, 235 (E.D.N.Y.1997) ("The indifferent attempts to plead the existence of an enterprise fall short of their goal in that they frustrate assiduous efforts to identify its membership, its structure (formal or informal), or its functional unity."). Plaintiffs' "conclusory naming of a string of entities does not adequately allege an enterprise." Moy v. Terranova, 1999 WL 118773, at *5 (E.D.N.Y. Mar.2, 1999) (internal quotation marks omitted); see First Nationwide, 820 F.Supp. at 98; accord A. Burton White, M.D., P.C. v. Beer, 679 F.Supp. 207, 210-11 (E.D.N.Y.1988); see also Richmond v. Nationwide Cassel L.P., 52 F.3d 640, 646 (7th Cir.1995) (affirming dismissal of complaint). Accordingly, we conclude that Plaintiffs have failed to allege adequately that the Vahabzadeh Enterprise was indeed a RICO enterprise.
 
 2. The Bankruptcy Estate Enterprise
 
 59
 The Bankruptcy Estate Enterprise allegedly consisted of Sohrab; Vahabzadeh & Co., Inc.; the Bankruptcy Estate; the law firm of Fischoff & Associates; Robert Fisher, Esq.; and Robert Herzog, Esq. Plaintiffs alleged that, while "[t]he legitimate purpose of the Bankruptcy Estate Enterprise was to liquidate Sohrab's assets, to pay off his debts to the extent possible[,] and to obtain relief from [his] creditors," Sohrab in fact "manipulated the Bankruptcy Estate so that it functioned as a vehicle for defrauding [P]laintiffs and other creditors."
 
 
 60
 As an initial matter, we note that it is a question of first impression in this Circuit whether a bankruptcy estate may, itself, be deemed a RICO enterprise. In the only published decision thus far identified as having addressed whether a bankruptcy estate could be deemed such an enterprise, however, the Eighth Circuit had no difficulty concluding that it could. See Handeen v. Lemaire, 112 F.3d 1339, 1353 (8th Cir.1997); cf. Gunther v. Dinger, 547 F.Supp. 25, 27 (S.D.N.Y.1982) (holding that a probate estate qualified as RICO enterprise).[13] We agree that, under certain circumstances, a bankruptcy estate may qualify as a RICO enterprise. Here, because we conclude that Plaintiffs have failed to plead adequately that Defendants conducted or participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity, see discussion infra Part C, we assume without deciding that Plaintiffs have adequately pled the existence of the Bankruptcy Estate Enterprise.
 
 B. Conducting the Enterprise's Affairs
 
 61
 For RICO purposes, simply establishing the presence of an enterprise is not enough. Plaintiffs must also allege that the defendants "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); see Reves v. Ernst & Young, 507 U.S. 170, 177-79, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). In Reves, the Supreme Court explained this to mean that the defendant must have had "some part in directing [the enterprise's] affairs." 507 U.S. at 179, 113 S.Ct. 1163. "Of course, the word `participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase `directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise[;] but some part in directing the enterprise's affairs is required." Id. (footnote omitted).
 
 
 62
 "The `operation or management' test expresses this requirement in a formulation that is easy to apply." Id. Simply put, "one is liable under RICO only if he `participated in the operation or management of the enterprise itself.'" Azrielli v. Cohen Law Offices, 21 F.3d 512, 521 (2d Cir.1994). In this Circuit, the "operation or management" test typically has proven to be a relatively low hurdle for plaintiffs to clear, see, e.g., Baisch v. Gallina, 346 F.3d 366, 377 (2d Cir.2003); De Falco v. Bernas, 244 F.3d 286, 309 (2d Cir.2001), especially at the pleading stage, cf. United States v. Allen, 155 F.3d 35, 42-43 (2d Cir.1998) (holding the question whether defendant "operated or managed" the affairs of an enterprise to be essentially one of fact).[14] Ultimately, however, it is clear that the RICO defendant must have played "some part in directing [the enterprise's] affairs." De Falco, 244 F.3d at 310; see Reves, 507 U.S. at 178-79, 113 S.Ct. 1163. With these precedents in mind, we turn to an examination of Plaintiffs' allegations with regard to Afsar's and Sohrab's respective roles in the conduct of the affairs of the Bankruptcy Estate Enterprise.[15]
 
 
 63
 We note as a preliminary matter that the distinction between the level of control afforded the bankruptcy debtor under Chapter 7, as distinguished from that afforded under Chapter 13, may be relevant to the RICO analysis in some cases.[16] (In contrast to the defendants in Handeen, 112 F.3d at 1349-50, and AD-X Int'l, 97 Fed. Appx. at 266, both of whom filed petitions under Chapter 13, Sohrab filed his bankruptcy petition under Chapter 7.) Nonetheless, we think it fairly self-evident that, even in the Chapter 7 context, a debtor wields a significant degree of control over the conduct of the affairs of the estate. Notably, in Handeen, the Eighth Circuit found that "navigat[ing] the estate through the bankruptcy system," creating "sham debts to dilute the estate," preparing "filings and schedules containing erroneous information," and "participat[ing] in devising a scheme to conceal [sources of income] from the bankruptcy trustee" all amounted to conducting or participating in the affairs of a Chapter 13 bankruptcy estate enterprise. 112 F.3d at 1350. Many of these activities are analogous to actions that a Chapter 7 debtor would typically be involved in, at least to the extent of furnishing the necessary information to the trustee. In any event, here, the Chapter 7/Chapter 13 dichotomy presents a distinction without a difference, at least with respect to Sohrab, given the degree to which he sought to manipulate the estate, conceal assets, and misrepresent information to the trustee.[17]
 
 1. Sohrab
 
 64
 Plaintiffs allege that Sohrab participated in the conduct of the affairs of the Bankruptcy Estate Enterprise through the following predicate acts:
 
 
 65
 [x] 1995 transfer of his interests in Tiburon and Timberland to Sphinx Rock and Satinwood;
 
 
 66
 [x] 1997 pre-bankruptcy-petition transfer of his inheritance to Afsar and to his brother, Iradj;
 
 
 67
 [x] July 1997 filing of a materially false bankruptcy petition;
 
 
 68
 [x] 1997-99 assorted perjuries occurring at a creditors' meeting, during Rule 2004 examinations, and at a bankruptcy discharge proceeding; and
 
 
 69
 [x] 1997 pre-petition transfers, in relation to the Bankruptcy Estate Enterprise, to his wife, brother-in-law, and father-in-law.
 
 
 70
 We find that Plaintiffs have adequately alleged that Sohrab conducted or participated in the conduct of the affairs of the Bankruptcy Estate Enterprise. Indeed, this conclusion seems almost unavoidable, given that even where the trustee must subpoena the debtor's records, it is still the debtor who is the primary source of the most relevant information pertaining to the affairs of the estate. See, e.g., In re Hyde, 235 B.R. 539, 542-43 (S.D.N.Y.1999). Moreover, we find it difficult to envision a scenario in which a debtor such as Sohrab, who was denied a discharge for bankruptcy fraud, could not be deemed to have played at least some part in directing the affairs of the bankruptcy estate.
 
 2. Afsar
 
 71
 With respect to Afsar, Plaintiffs alleged that she conducted or participated in the conduct of the affairs of the Bankruptcy Estate Enterprise through the following acts:
 
 
 72
 [x] 1997-1999 monthly $5000 wire transfers to Sohrab (the money coming from the inheritance Sohrab had previously transferred to Afsar);
 
 
 73
 [x] Afsar's pre-petition receipt of assets from Sohrab, a debtor who was allegedly intending to defeat the purpose of the Bankruptcy Code;
 
 
 74
 [x] 1998 letter in response to a request by the Bankruptcy Court in which Afsar falsely stated that she did not have in her possession, and would not turn over, any documents relating to Soleyman's estate; [x] 1998 affidavit in which Afsar allegedly misrepresented Soleyman as an Iranian citizen; and
 
 
 75
 [x] 1998 declarations made by Afsar's attorney Russell McRory that Soleyman died without owning any assets.
 
 
 76
 It is clear that Afsar was an outsider to the estate. Nonetheless, "outsiders who associate with an enterprise will be liable if they `participate in the operation or management of the enterprise itself.' To put it another way, outsiders, like all other people, will be liable [under RICO] ... if their actions satisfy the operation or management test." Handeen, 112 F.3d at 1349 n. 12 (quoting Reves, 507 U.S. at 184-85, 113 S.Ct. 1163).
 
 
 77
 Here, Plaintiffs' allegations — taken as true, as they must be — paint a picture of a mother helping her son to defraud the bankruptcy court and trustee. We have concluded that where a bankruptcy estate is a RICO enterprise, a debtor who engages in bankruptcy fraud conducts or participates in the conduct of the affairs of the enterprise; thus, it is no great leap to find that one who assists in the fraud also conducts or participates in the conduct of the affairs of the enterprise. Cf. 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").
 
 
 78
 In any event, because Afsar's liability is also premised on a RICO conspiracy theory (under Count Six), the standard we apply to her is even more relaxed: "[T]he requirements for RICO[ ] conspiracy charges under § 1962(d) are less demanding: A `conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that [she has adopted] the goal of furthering or facilitating the criminal endeavor.'" Baisch v. Gallina, 346 F.3d at 376-77 (2d Cir.2003) (quoting Salinas v. United States, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)). Accordingly, we find that Plaintiffs have alleged — albeit barely — that Afsar conducted or participated in the conduct of the affairs of the Bankruptcy Estate Enterprise.
 
 C. RICO Pattern
 
 79
 Next, we examine whether Plaintiffs have adequately alleged a RICO pattern. To survive Defendants' motion to dismiss the substantive RICO count of the Amended Complaint (Count Five), alleging a violation of 18 U.S.C. § 1962(c), Plaintiffs must have alleged that they were injured by Defendants' conduct of an enterprise through a pattern of racketeering activity. Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir.1999). For these purposes, a "pattern of racketeering activity" consists of "at least two [predicate] acts of racketeering activity" committed in a ten-year period, 18 U.S.C. § 1961(5), which "`amount to or pose a threat of continued criminal activity,'" Cofacredit, 187 F.3d at 242 (quoting H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). Here, as the District Court concluded, the alleged predicate acts at the temporal extremes of the pattern alleged in the Amended Complaint were not pled with sufficient particularity, and, without those acts, the Amended Complaint fails to allege the requisite continuity to sustain a RICO claim.
 
 
 80
 Allegations of bankruptcy fraud, like all allegations of fraudulent predicate acts, are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). See Moore v. PaineWebber, Inc., 189 F.3d 165, 172 (2d Cir.1999); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994). In addition to alleging the particular details of a fraud, "the plaintiffs must allege facts that give rise to a strong inference of fraudulent intent," Moore v. PaineWebber, Inc., 189 F.3d at 173 (emphasis added; internal quotation marks omitted); accord Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir.1995); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994).
 
 
 81
 Here, Plaintiffs have failed to allege facts that yield a strong inference that, in 1995, Sohrab transferred his interests in Timberland and Tiburon "in contemplation of" bankruptcy, as 18 U.S.C. § 152(7) requires. Those transfers, as well as the alleged transfers of cash from Sohrab to Soleyman, occurred nearly two years before Sohrab filed for bankruptcy and before the judgments were entered against Sohrab that would motivate him to conceal his assets. Thus, these acts do not support the required strong inference of fraudulent intent.
 
 
 82
 In contrast, a debtor who has deliberately transferred assets a year and a day prior to filing a petition has clearly engaged in a thinly-veiled attempt to avoid the preference rule. See, e.g., United States v. Dandy, 998 F.2d 1344, 1348 (6th Cir.1993). Similarly, a debtor who has followed a course of conduct that inevitably leads to bankruptcy is fairly presumed to have perpetrated a fraudulent scheme. See, e.g., United States v. Tashjian, 660 F.2d 829, 841 (1st Cir.1981); United States v. Ciampaglia, 628 F.2d 632, 636, 643 (1st Cir.1980). A review of these and other representative cases in which intent was properly inferred, however, makes clear that the conduct of the bankruptcy debtors in those cases is plainly distinguishable from the alleged fraudulent acts of Sohrab in 1995. In sum, the Amended Complaint, read as a whole, fails to provide support for a strong inference that Sohrab intended to defeat the provisions of the bankruptcy code in 1995, and, therefore, the allegations concerning the 1995 transfers do not adequately plead a predicate act of bankruptcy fraud.
 
 
 83
 As to the alleged predicate acts at the other temporal extreme — Sohrab's transfer of his inheritance to Afsar in early 1997, and her transfer of funds back to him over the next two years — Plaintiffs have failed to plead with sufficient particularity the circumstances constituting bankruptcy fraud. See Fed.R.Civ.P. 9(b). The Amended Complaint fails to explain either how or when Sohrab received assets from Soleyman, what those assets were, or how or when Sohrab conveyed or concealed assets in contemplation of bankruptcy. Moreover, there is nothing in the record to support the allegation that when Afsar wired monies to Sohrab, she was sending him his own assets in an effort to help him conceal them, rather than sending him gifts of money like those that she routinely sent to Sohrab's siblings during the same period.
 
 
 84
 In seeking to excuse these deficiencies, Plaintiffs misconstrue the exceptions to Rule 9(b). Although it is true that matters peculiarly within a defendant's knowledge may be pled "on information and belief," this does not mean that those matters may be pled lacking any detail at all.[18] See DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir.1987) ("[T]he allegations must be accompanied by a statement of the facts upon which the belief is based."). Nor do allegations of motive and opportunity alone suffice. While "the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity," "the actual ... fraud alleged must be stated with particularity." Wight v. Bankamerica Corp., 219 F.3d 79, 91 (2d Cir.2000) (internal quotation marks omitted). Moreover, we are hindered in our efforts to draw reasonable inferences in Plaintiffs' favor, because we cannot understand why Sohrab's relatives would secretly agree to disclaim their interest in Soleyman's estate only so that Sohrab — who was supposedly contemplating bankruptcy at the time — could then convey the assets back to Afsar, who would then transfer money back to Sohrab. Lacking both particularity and rationality, these allegations likewise fail to allege predicate acts adequately.
 
 
 85
 Thus, the only remaining alleged predicate acts are those allegedly committed by Sohrab between April 1997 and October 1999:
 
 
 86
 [T]he properly pled predicate acts allegedly committed by Sohrab ... consist of a handful of transfers in contemplation of bankruptcy in a four-month period immediately prior to the filing of his petition on July 17, 1997, the filing of a materially false bankruptcy petition, perjuring himself at a September 4, 1997 meeting of his creditors and a Bankruptcy Rule 2004 examination on September 16, 1997, submitting a false affidavit regarding certain trust property on June 25, 1998, during the course of discovery in the [Adversary Proceeding], and perjuring himself at trial in the [A]dversary [P]roceeding in October 1999.
 
 
 87
 and those allegedly committed by Afsar between March and September, 1998:
 
 
 88
 [T]he properly pled predicate acts allegedly committed by Afsar ... allegedly were committed between March and September 1998, solely in connection with the [Adversary Proceeding]. They consisted of acts of mail fraud and misrepresentations to the bankruptcy court, purportedly designed to stonewall [P]laintiffs' discovery efforts.
 
 
 89
 FCAM III, 219 F.Supp.2d at 584-85 (footnotes omitted). We agree with the District Court that these acts do not amount to a pattern of racketeering activity.
 
 
 90
 "[A] plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." GICC Capital Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463, 466 (2d Cir.1995) (internal quotation marks omitted). "To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." Cofacredit, 187 F.3d at 242. In analyzing the issue of continuity, assuming arguendo that the alleged predicate acts constituting the pattern were adequately pled, we evaluate the RICO allegations with respect to each defendant individually. See De Falco v. Bernas, 244 F.3d at 306, 322 n. 22 (2d Cir.2001); United States v. Persico, 832 F.2d 705, 714 (2d Cir.1987).
 
 
 91
 Here, the nature of Sohrab and Afsar's alleged scheme to defraud Sohrab's creditors does not "impl[y] a threat of continued criminal activity." Cofacredit, 187 F.3d at 243. Unlike, for example, organized crime, see, e.g., United States v. Minicone, 960 F.2d 1099, 1107 (2d Cir.1992); Indelicato, 865 F.2d at 1384, Sohrab's and Afsar's alleged bankruptcy fraud was "inherently terminable," GICC, 67 F.3d at 466 (emphasis omitted).[19] Once Sohrab had fraudulently conveyed his assets, which he allegedly accomplished by July 17, 1997 when he filed for bankruptcy, the scheme essentially came to its conclusion. See Cofacredit, 187 F.3d at 244. Thus, here, as in GICC, it "defies logic to suggest that a threat of continued looting activity exists when," as Plaintiffs admit, "there is nothing left to loot." 67 F.3d at 466.
 
 
 92
 Notwithstanding the fact that Sohrab's bankruptcy case appears to remains open, see FCAM III, 219 F.Supp.2d at 584, and that predicate acts of perjury and mail fraud continued for some time after Sohrab filed his bankruptcy petition, no predicate acts have occurred since December 1999, which suggests that the scheme has wound to a close. In any event, even if it has not, continued silent concealment of assets is not a predicate act. See Thai Airways Int'l Ltd. v. United Aviation Leasing B.V., 891 F.Supp. 113, 119 n. 1 (S.D.N.Y.1994), aff'd, 59 F.3d 20 (2d Cir.1995) (per curiam). Thus, assuming arguendo that the alleged predicate acts set forth above were adequately pled, and evaluating the RICO allegations with respect to each defendant individually, see De Falco, 244 F.3d at 306, 322 n. 22; Persico, 832 F.2d at 714, we conclude that the alleged predicate acts do not "amount to or pose a threat of continued criminal activity," H.J. Inc., 492 U.S. at 239, 109 S.Ct. 2893, and, accordingly, that the Amended Complaint fails to allege an open-ended pattern of racketeering activity.
 
 
 93
 A closed-ended pattern of racketeering activity involves predicate acts "extending over a substantial period of time." GICC, 67 F.3d at 466 (internal quotation marks omitted). Notably, this Court has never found a closed-ended pattern where the predicate acts spanned fewer than two years. See FCAM I, 150 F.Supp.2d at 634 & nn. 37-41; Mason Tenders Dist. Council Pension Fund v. Messera, 1996 WL 351250 at *8-9, 1996 U.S. Dist. LEXIS 8929, at *20-21 (S.D.N.Y. June 25, 1996) (citing, inter alia, GICC, 67 F.3d at 467).[20] Although continuity is "primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." De Falco, 244 F.3d at 321; accord Cofacredit, 187 F.3d at 242-44; GICC, 67 F.3d at 467-68; see also Estate of Andy Warhol, 119 F.3d at 98 ("[C]ourts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO."). Thus, while two years may be the minimum duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern.
 
 
 94
 Here, the remaining alleged predicate acts attributed to Afsar, which span barely seven months, do not extend over a sufficiently long period of time to satisfy the requirements of closed-ended continuity. Therefore, the District Court properly dismissed Count Five as alleged against her. And although Sohrab committed his last predicate act roughly two-and-a-half years after his first predicate act, we agree with the District Court that closed-ended continuity was lacking with respect to him as well.
 
 
 95
 The first adequately pled predicate act committed by Sohrab, a fraudulent conveyance, occurred in April 1997. Sohrab committed additional fraudulent conveyances until July 17, 1997, when he filed a false bankruptcy petition. He then gave false testimony at a meeting with his creditors on September 4, 1997 and at his Rule 2004 examination on September 16, 1997; submitted a falsified trust agreement to the Bankruptcy Court in November 1997; and filed a false affidavit relating to that agreement in June 1998. After this, no additional predicate acts occurred for more than a year — until October 1999, when Sohrab perjured himself in a trial before the Bankruptcy Court. That perjury, however, involved the same misrepresentations that Sohrab made to his creditors on September 4, 1997. Although we stop short of holding that Sohrab's final act of perjury does not qualify as a predicate act, we note that it did not incrementally injure Plaintiffs or the Bankruptcy Estate, cf. United States v. Graham, 60 F.3d 463, 467 (8th Cir.1995); United States v. Berardi, 629 F.2d 723, 729 (2d Cir.1980) ("[A] single lie merits but a single punishment...."), and that the other predicate acts spanned only a little more than a year. Further, we agree with the District Court that every factor other than duration cuts against a finding of closed-ended continuity in this case.
 
 
 96
 At bottom, Plaintiffs have alleged that Sohrab engaged in a single scheme to defraud two creditors by quickly moving his assets to his relatives and then concealing the existence of those assets during his bankruptcy proceeding. But however egregious Sohrab's fraud on Plaintiffs may have been, they have failed to allege that he engaged in a pattern of racketeering activity. Accordingly, Count Five was properly dismissed as alleged against him.
 
 
 97
 Finally, because Plaintiffs did not adequately allege a substantive violation of RICO in Count Five on the part of either Sohrab or Afsar, the District Court properly dismissed Count Six, which alleged a RICO conspiracy in violation of 18 U.S.C. § 1962(d). See Cofacredit, 187 F.3d at 244; Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir.1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."), vacated on other grounds, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998).[21]
 
 III. Supplemental Jurisdiction
 
 98
 As noted above, the District Court declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims after dismissing Plaintiffs' RICO claims prior to trial. See FCAM III, 219 F.Supp.2d at 588. "The exercise of supplemental jurisdiction is left to the discretion of the district court, and this [C]ourt's review is limited to whether the district court abused its discretion." Ametex Fabrics, Inc. v. Just In Materials, Inc., 140 F.3d 101, 105 (2d Cir.1998) (internal quotation marks omitted); see Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir.1994). "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." Castellano v. Bd. of Trustees, 937 F.2d 752, 758 (2d Cir.1991) (internal quotation marks omitted). "Moreover, the discretion implicit in the word `may' in subdivision (c) of [28 U.S.C.] § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants." Purgess, 33 F.3d at 138; see Castellano, 937 F.2d at 758.
 
 
 99
 Here, the District Court dismissed the Amended Complaint well before trial — for that matter, even before significant discovery had taken place. Moreover, many of the litigants are foreign nationals, and this case is likely to go on for years. Accordingly, we find that the District Court did not abuse its discretion in declining to exercise supplemental jurisdiction over Plaintiffs' state-law claims.
 
 
 100
 * * * * * *
 
 
 101
 We have considered the parties' remaining arguments and find them to be without merit.
 
 CONCLUSION
 
 102
 For the foregoing reasons, we affirm the judgment of the District Court.
 
 
 
 Notes:
 
 
 *
 The Honorable Nicholas Tsoucalas, of the United States Court of International Trade, sitting by designation
 
 
 [1]
 In light of our disposition of the RICO and supplemental jurisdictional issues, we need not — and do not — reach the other issues raised by Plaintiffs on appeal. Similarly, we do not address the merits of the cross-appeal
 
 
 [1]
 See First Capital v. N. Am. Consortium, No. 133996/94 (N.Y. Sup.Ct., N.Y. County Feb. 27, 1997).
 
 
 [2]
 See First Capital Asset Mgmt., Inc. v. N.A. Partners, L.P., No. 97/602189 (N.Y. Sup.Ct., N.Y. County Oct. 22, 1998).
 
 
 [3]
 See First Capital Asset Mgmt., Inc. v. N.A. Partners, L.P., 260 A.D.2d 179, 688 N.Y.S.2d 25 (1st Dep't) (vacating the trial court's judgment insofar as it dismissed petition against Sohrab and otherwise affirming), leave to appeal denied, 93 N.Y.2d 817, 697 N.Y.S.2d 564, 719 N.E.2d 925 (1999).
 
 
 [4]
 See First Capital Asset Mgmt., Inc. v. N.A. Partners, L.P., No. 97/602189 (N.Y. Sup.Ct., N.Y. County June 27, 2001).
 
 
 [5]
 See Oost-Lievense v. N. Am. Consortium, P.C., 969 F.Supp. 874 (S.D.N.Y.1997).
 
 
 [6]
 See In re Vahabzadeh, Sohrab, No. 97-44779 (Bankr.S.D.N.Y. Dec. 10, 1999) (Chapter 7 case); First Capital Asset Mgmt., Inc. v. Vahabzadeh, No. 97-9107A (Bankr.S.D.N.Y. Dec. 10, 1999) (adversary proceeding).
 
 
 [7]
 See First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 2002 WL 413910, 2002 U.S. Dist. LEXIS 4210 (S.D.N.Y., Mar. 15, 2002).
 
 
 [8]
 The Amended Complaint did not assert claims against the Failly Defendants. Accordingly, in an order dated March 15, 2002, the District Court noted that the action had been terminated as against each of those defendantsSee First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 2002 WL 413910, 2002 U.S. Dist. LEXIS 4210 (S.D.N.Y. Mar. 15, 2002). In addition, by an order dated July 12, 2002, the District Court dismissed the action with respect to Schlegelmilch and Iradj Vahabzadeh for lack of prosecution. See FCAM II, 218 F.Supp.2d at 377 n. 3.
 
 
 [9]
 Plaintiffs alleged, on both the substantive and conspiracy claims, that Plaintiffs "suffered injuries proximately caused by the bankruptcy crimes and mail frauds set forth above, including, but not limited, to the following: (a) [t]he loss of any ability to satisfy their claims and judgments out of assets Sohrab was entitled to inherit from Soleyman and receive from Soleyman's Estate; (b) [the attorneys'] fees and expenses incurred in prosecuting their objections to Sohrab's fraudulent Chapter 7 petition in theFirst Capital v. Vahabzadeh adversary proceeding; and (c) [t]he loss of any ability to execute directly against the assets Sohrab had gratuitously transferred to Afsar and Sohrab's siblings." FCAM II, 218 F.Supp.2d at 379-80.
 
 
 [10]
 In a later opinion,see infra, the District Court expanded on this analysis somewhat, clarifying the point that the claim for Lost Debt injuries was dismissed, not simply because Plaintiffs lacked standing, but more precisely because that claim was not ripe for review. See FCAM III, 219 F.Supp.2d at 578.
 
 
 [11]
 See supra note 10 and accompanying text.
 
 
 [12]
 In addition, of course, the enterprise must be engaged in, or the activities of the enterprise must affect, interstate or foreign commerce. 18 U.S.C. § 1962. In this Circuit, however, RICO plaintiffs may satisfy this element by showing only "a minimal effect on interstate commerce."De Falco v. Bernas, 244 F.3d 286, 309 (2d Cir.2001); see United States v. Barton, 647 F.2d 224, 233 (2d Cir.1981) (noting that the "impact" on interstate commerce "need not be great"). Here, the alleged activities affected creditors in various states and involved assets held in, and transferred among, accounts located in various countries. Thus, Plaintiffs alleged at least a de minimis impact on interstate or foreign commerce.
 
 
 [13]
 The Tenth Circuit reached the same conclusion in an unpublished opinion,AD-X Int'l, Inc. v. Kolbjornsen, 97 Fed. Appx. 263, 266 (10th Cir.2004), which we cite here not for its precedential value (as, indeed, it has none), but because "it has persuasive value with respect to a material issue that has not been addressed in a published opinion" of that court, U.S.Ct.App. 10th Cir. R. 36.3.
 
 
 [14]
 But see, e.g., Azrielli, 21 F.3d at 521-22 (dismissing a RICO claim against an attorney, noting that the attorney failed to satisfy the operation or management test by acting only in his capacity as a lawyer); see also Redtail Leasing, Inc. v. Bellezza, 2001 WL 863556, at *4 (S.D.N.Y. July 31, 2001) (dismissing a § 1962(c) claim where the complaint failed to allege that the defendant directed wrongful conduct).
 
 
 [15]
 Plaintiffs concede that Ahmed did not conduct the affairs of either alleged RICO enterprise and that Ahmed's liability as a RICO conspirator is wholly dependent on the substantive RICO liability of Sohrab and Afsar
 
 
 [16]
 Chapter 13 of the bankruptcy code provides for an individual debtor with regular income to submit a plan to adjust his or her debts. 1Collier on Bankruptcy ¶ 1.03[6] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2004). The debtor is thereby permitted, pursuant to the plan, to pay off his or her debts from the regular source of income without having to relinquish any assets. Id. As this Court has noted, "[t]he reality ... under Chapter 13 is that the debtors are the true representatives of the estate and should be given the broad latitude essential to control the progress of their case." Olick v. Parker & Parsley Petroleum Co., 145 F.3d 513, 515 (2d Cir.1998) (quoting In re Freeman, 72 B.R. 850, 854 (Bankr.E.D.Va.1987)); accord Handeen, 112 F.3d at 1349-50. Chapter 7, on the other hand, provides for the appointment of trustee who is charged with administering the bankruptcy estate and overseeing the liquidation of the debtor's assets. 1 Collier on Bankruptcy, supra, ¶ 1.03[2][a], [2][c].
 
 
 [17]
 See supra note 6 and accompanying text.
 
 
 [18]
 Moreover, we are not convinced that records of Swiss probate proceedings, which presumably would illuminate the flow of Soleyman's assets, such as they existed, are matters peculiarly within Defendants' knowledge
 
 
 [19]
 Compare, e.g., De Falco, 244 F.3d at 324 (defendants' escalating threats "indicated that they had no intention of stopping once they met some immediate goal"); Azrielli, 21 F.3d at 521 (defendants continued to engage in same fraud for many years); Proctor & Gamble Co. v. Big Apple Indus. Bldgs., 879 F.2d 10, 18 (2d Cir.1989) (defendants embarked on a scheme that would necessarily involve predicate acts over the course of a decade).
 
 
 [20]
 We do note that inCosmos Forms Ltd. v. Guardian Life Ins. Co. of Am., 113 F.3d 308, 310 (2d Cir.1997), this Court found "approximately seventy acts" spread over fifteen months sufficient to constitute a RICO pattern, but apparently an open-ended one. Moreover, in Cosmos Forms, there was clearly a threat of continued criminal activity, distinguishing that case from the one at bar. See 113 F.3d at 310.
 
 
 [21]
 Because we agree with the District Court that Counts Five and Six were insufficiently pled, we need not — and do not — reach the merits of the District Court's decisions regarding either ripeness, standing, or personal jurisdiction